UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 12-113 (ADM/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Lewis Pate,** | |
| Defendant. | |

Jeffrey S. Paulsen, Assistant United States Attorney, for Plaintiff.
Douglas Olson for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on June 13, 2012 on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 24), Defendant's Motion to Suppress Eyewitness Identification (ECF No. 25) and Defendant's Motion to Suppress Statements, Admissions and Answers (ECF No. 26). At the hearing, the Court received testimony from St. Paul Police Officers Don Benner and Tim Filiowich. The Government submitted two exhibits into evidence.[1] The parties have since submitted post-hearing briefs. (ECF Nos. 36 and 37.)

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends Defendant's suppression motions be **DENIED**.

## I.   FINDINGS OF FACT

---

[1] Government's Exhibit 1 is an application for a search warrant and an receipt, inventory and return for an address on Margaret Street. Government's Exhibit 2 is a Saint Paul Police Department Advice of Rights Form.

1

A.        **Testimony of Sergeant Don Benner**

At the hearing in this matter, St. Paul Police Sergeant Don Benner testified that on the afternoon of March 20, 2012, he heard a radio report that gunshots had been fired in the area of Minnehaha Avenue in St. Paul. Sergeant Benner heard over the radio that a witness named Clatt reported seeing two men chasing a third man. The third man turned and fired a gun at his pursuers, then ran southbound on Cypress Street. The lone man was described as a black male wearing dark colored jeans and a dark sweatshirt. When Sergeant Benner heard these reports, he was already en route to an address on Margaret Street, near the area where gunshots were reported, as part of an investigation of an unrelated matter. Sergeant Benner heard over the radio that another officer was with a suspect in the alley behind the same address on Margaret Street to which he was already headed.

Sergeant Benner proceeded to the front door of the house on Margaret Street. He spoke to one of the occupants and explained to her that they were searching for a suspect in a shooting. While he was speaking with the occupant, a canine officer arrived and told him that they had been tracking the suspect from where the witness, Mr. Clatt, saw the shooting and that the dog lost the scent trail around the front of the house on Margaret Street. Sergeant Benner then asked the occupant to let him inside, but she denied permission to enter the house, stating that she wanted to contact the homeowner. She also stated that there were no men in the house, only children. At this time, Sergeant Benner heard over the radio that a witness had seen one of the shooters enter the house on Margaret Street.

Sergeant Benner ordered the occupant and the children out of the house and prepared to conduct a protective sweep. Officers announced from the threshold of the house that they were

going to release the police dog and that anyone in the house should come out now. Before the dog was released, Defendant came down the stairs. While coming down the stairs, Defendant stated, "I'm the guy they were shooting at." Defendant matched the description of the lone male shooter, with the exception that he was wearing a white t-shirt rather than a sweatshirt. Sergeant Benner testified that he knew Defendant from prior dealings and was aware that he had multiple outstanding traffic warrants. Defendant was taken into custody on the traffic warrants and as a suspect in the shooting. The eyewitness, Mr. Clatt, was brought to the scene to do an on-scene show-up, then Defendant was taken to the police station. Defendant was searched, and no gun was found in his possession.

The police then obtained a search warrant for the house on Margaret Street. The facts, as described above, were set out in the search warrant affidavit. (Government Ex. 1.) When police executed the search warrant they found a gun in a lower level bathroom, wrapped in a brown towel inside a laundry hamper. The gun was a loaded six-shot revolver with shots missing. Police also found a black sweatshirt behind the couch in the living room.

Sergeant Benner testified that Defendant was not an occupant or overnight guest of the house on Margaret Street. When questioned about any connection between Defendant and the house on Margaret Street, Sergeant Benner testified that Defendant was a known associate of Leon Franklin, who had dated one of the occupants of the house. On one occasion, police responded to an incident involving Mr. Franklin at the house on Margaret Street, and it was reported that Defendant was outside in the car.

The next day, Sergeant Benner interviewed Defendant at the Ramsey County Law Enforcement Center. Sergeant Benner read Defendant a standard Saint Paul Police Department

advice of rights form. Defendant agreed to speak with law enforcement and initialed and signed the advice of rights form. (Govt. Ex. 2.) Defendant never asked for an attorney or to terminate the interview, which lasted just over half an hour.

**B.     Testimony of Officer Tim Filiowich**

St. Paul Police Officer Tim Filiowich also responded to the shots fired call on March 20, 2012. Officer Filiowich was flagged down by Mr. Clatt on Minnehaha Avenue. Mr. Clatt stated that he was in the alley when he heard three or four gunshots. He turned and saw two black men chasing another black man. The lone man turned and fired a gun at the two men pursuing him. The lone man saw Mr. Clatt, then continued running southbound. Mr. Clatt stated that he was about 75 feet from the single black man and that they had locked eyes. He stated that he thought he could identify the shooter if he saw him again. He described the man as five feet six inches to five feet eight inches tall with a thin build, wearing dark jeans and a black sweatshirt.

After Defendant was arrested and placed in a squad car outside the house on Margaret Street, Officer Filiowich told Mr. Clatt that they had a suspect in custody and asked Mr. Clatt to identify whether it was the same man he had seen. He brought Mr. Clatt to the house on Margaret Street. Mr. Clatt remained in the vehicle, while Defendant was taken out of a squad car and brought to stand in the middle of the street. Defendant's hands were cuffed behind his back. Mr. Clatt identified Defendant as the shooter he had seen earlier, but stated that he was wearing a different shirt. Officer Filiowich estimated that no more than seven minutes had passed between the report of gunshots and his arrival on scene. He estimated that no more than twenty minutes passed between his conversation with Mr. Clatt and the show-up in front of the house on Margaret Street.

## II.     CONCLUSIONS OF LAW

**A.      Motion to Suppress Evidence Obtained as a Result of Search and Seizure**

Defendant seeks to suppress the gun obtained as a result of the search of the house on Margaret Street. Defendant argues that the search warrant was issued without a sufficient showing of probable cause. The Supreme Court has held that Fourth Amendment rights are "personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968). A defendant can claim a violation of his Fourth Amendment rights only if he "has a legitimate expectation of privacy in the invaded place" and if such expectation of privacy is "one that society is prepared to recognize as reasonable." *Rakas v. Illinois*, 439 U.S. 128, 143-144 (1978), quoting *Katz v. United States*, 389 U.S. 347, 361 (1967).

The Supreme Court has held that an overnight guest has a reasonable expectation of privacy in a residence, but that other guests of the homeowner who do not stay the night do not have such an expectation. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990); *Minnesota v. Carter*, 525 U.S. 83, 88-90 (1998). The Supreme Court has made clear that "one who is merely present" inside a residence, without some further connection to the place, does not have a reasonable expectation of privacy. *Carter*, 525 U.S. at 90.

Defendant argues that he had an expectation of privacy in the house on Margaret Street because "he was found in the residence and the government maintains that he had a sufficient nexus to the residence such that a gun discovered in the upstairs bathroom was constructively in his possession." (Def. Mem. at 5, ECF No. 36.) Defendant has made no showing that he had any connection to the residence beyond hiding there on March 20. He has not shown that he was an

5

overnight guest, or even that he was present with the homeowner or occupant's permission. Additionally, the fact that Defendant may have left his gun in the residence has no bearing on whether he had a reasonable expectation of privacy in that space. Defendant had no reasonable expectation of privacy in the house on Margaret Street, therefore the search of that house did not violate Defendant's Fourth Amendment rights. Defendant's motion to suppress evidence obtained as a result of search and seizure should be denied.

### B.    Motion to Suppress Statements

Defendant seeks to suppress both his statement at the time of his arrest that "he was the one being shot at" and his statements in a later custodial interview. Defendant argues that both of these statements are the fruit of an illegal search and the illegal seizure of his person resulting from the threat of releasing the police dog into the house. Defendant argues that police did not have probable cause for the search or to take him into custody. Defendant does not claim that police failed to advise him of his *Miranda* rights or that his in-custody statement was involuntary.

#### 1.    Defendant's statements were not the result of an illegal search.

Defendant characterizes his arrest and all of his subsequent statements as the result of a police search of the house. However, Defendant himself admits that he came downstairs and exited the house before police actually entered the house to conduct a protective sweep. Defendant argues, without providing any citation in support of his position, that the threat of releasing the police dog constitutes a search and must be supported by probable cause.

Even if the police conduct of notifying Defendant that they were about to release the dog were to be considered a search, Defendant has no standing to challenge a search of the house, as discussed above. Additionally, a search of the house was justified by exigent circumstances. While

the Fourth Amendment generally requires police to obtain a warrant before entering a home, the Supreme Court has held that police may enter a home without waiting for a warrant in the face of certain exigent circumstances, including the reasonable belief that a person within is in need of immediate aid. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Police may conduct a protective sweep "if the facts would justify a reasonable officer in believing that there might be someone dangerous in the house." *United States v. Spotted Elk*, 548 F.3d 641, 651 (8th Cir. 2008).

In this case, police had an eye witness report that a man had fired a gun at two other men. A police dog had followed a scent trail from the scene of the shooting to the house on Margaret Street. Police also had a report that a witness saw one of the shooters enter the house on Margaret Street. Sergeant Benner testified that based on this information he decided to do a protective sweep of the house. The facts here justify Sergeant Benner's belief that there might be someone dangerous in the house, which constitutes an exigent circumstance allowing a search of the house without a warrant. Defendant's statements to police were not the result of an illegal search.

**2.    Defendants statements were not the result of an illegal arrest.**

Defendant also argues that his statements should be suppressed as the result of his seizure without probable cause. "Probable cause for a warrantless arrest exists 'if the facts and circumstances within the law enforcement officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995), quoting *United States v. Morales,* 923 F.2d 621, 623 (8th Cir. 1991). "The probable cause determination does not depend upon individual facts," but rather "it depends on the cumulative effect of the facts in the totality of the circumstances." *Brown*, 49 F.3d at 1349 (quotation

omitted).

Considering the totality of the circumstances, the Court concludes that there was probable cause for Defendant's arrest. Police had heard an eye witness report that a lone black male fired a gun at two other men, then proceeded to run southbound. A police dog tracked a scent trail southbound from the scene of the shooting to the house on Margaret Street. Police then received a report that a witness had seen one of the shooters enter the house. Defendant, who emerged from the house in response to the police warning that they were entering with a dog, matched the physical description of the shooter provided by the eye witness. Police had probable cause to believe Defendant had fired a gun at two other individuals. Sergeant Benner testified that Defendant was also arrested because he had multiple outstanding warrants for traffic violations. Because police had probable cause to arrest Defendant, his statements were not the result of an illegal arrest and should not be suppressed.

Because neither Defendant's statement at the scene of his arrest nor his later custodial statements were the product of an illegal search or an illegal arrest, Defendant's motion to suppress statements should be denied.

**C.     Motion to Suppress Identification**

Defendant seeks to suppress the identification in this case, arguing that the show-up identification procedure used by police was unduly suggestive and the identification itself was unreliable.

Courts considering due process challenges to identification procedures use a two-part test. The first inquiry is whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012). If the

identification procedure was impermissibly suggestive and unnecessary, then the second inquiry is whether the identification was reliable under the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 106, 114 (1977). The identification will be considered reliable if it does not create a "substantial likelihood of misidentification." *Id.* When determining whether an identification is reliable, the court must consider the factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), including: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation.

The Eighth Circuit has held that "[a]bsent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998). The Court noted that on-the-scene confrontations are "essential to free innocent suspects and to inform the police if further investigation is necessary." *Id.* That same rational applies in this case, where police found an on-the-scene confrontation necessary to determine whether the man they found in the house on Margaret Street was the same man who had been seen firing a gun at his pursuers, or whether that man was still at large.

The Eighth Circuit held in *United States v. Pickar*, 616 F.3d 821, 828 (2010) that a show-up in which the suspect was handcuffed and standing between two officers in front of a marked police cruiser was not unduly suggestive. The Court distinguished the facts in *Pickar* from those in *Clark v. Caspari*, 274 F.3d 507, 509 (8th Cir. 2001), in which two African-American defendants were handcuffed and forced to lie face down on a driveway while an officer with a shotgun stood over them. The defendants were surrounded by white male police officers, and the witnesses saw one

of the defendants "being hauled to his feet" by an officer. *Id.* The Eighth Circuit found the procedures used in *Clark* to be improperly suggestive as they "increased the possibility of misidentification." *Id.* at 511. The court found that the procedure used in *Pickar* was "materially less suggestive" than that used in *Clark*, and that the procedure was not "unduly suggestive" for purposes of due process analysis. *Pickar*, 616 F.3d at 828.

The facts here are almost identical to those in *Pickar.* Defendant was handcuffed inside a police cruiser, then was lead by an officer into the middle of the street. The only notable difference was that in this case the officer turned Defendant around a few times so the witness could view him, whereas in *Pickar* the defendant stood still while an officer shined a flashlight in his face. The Court finds that the show-up procedure used in this case was not unduly suggestive.

Even if the show-up identification procedure used in this case were unduly suggestive, the Court finds that the identification was reliable under the *Neil v. Biggers* factors. The witness stated the he and the shooter looked each other in the face from about 75 feet away before the shooter turned and ran. This incident happened in the afternoon so lighting and visibility were good. The witness provided a description of the shooter that matched Defendant's height and build. The witness noted a discrepancy between his own prior description of a man wearing a black sweatshirt and Defendant's clothing at the show-up, noting that he had changed his shirt. Finally, by Officer Filiowich's estimate, no more than half an hour had passed between the shooting incident and the show-up. The Court finds that the identification was reliable under the totality of the circumstances. Because the identification procedure used was not unduly suggestive Defendant's motion to suppress identification evidence should be denied.

### III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1) Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 24) be **DENIED**;

2) Defendant's Motion to Suppress Eyewitness Identification (ECF No. 25) be **DENIED**; and

3) Defendant's Motion to Suppress Statements, Admissions and Answers (ECF No. 26) be **DENIED**.


DATED: July 18, 2012                                    *s/ Franklin L. Noel*
                                                        FRANKLIN L. NOEL
                                                        United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 1, 2012**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **August 1, 2012,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.