1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MINNESOTA

3

4    ------------------------------------------------------------

5                              )
     United States of America,   )  Case No. 12-CR-113(ADM/FLN)
6                              )
              Plaintiff,        )
7                              )
         vs.                   )  Minneapolis, Minnesota
8                              )  June 13, 2012
     Lewis Pate,                )  9:05 a.m.
9                              )
              Defendant.        )
10   ------------------------------------------------------------

11          BEFORE **THE HONORABLE FRANKLIN L. NOEL**

12       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13              **CRIMINAL MOTIONS HEARING**

14   APPEARANCES:

15   For the Plaintiff:      U.S. Attorney's Office
                             JEFFREY S. PAULSEN
16                           600 U.S. Courthouse
                             300 South Fourth Street
17                           Minneapolis, Minnesota 55415

18   For the Defendant:      Federal Public Defender's Office
                             DOUGLAS OLSON
19                           Suite 107, 300 South 4th Street
                             Minneapolis, Minnesota 55401
20

21                           DEFENDANT PRESENT

22

     Official Court Reporter:  JEANNE M. ANDERSON, RMR-RPR
23                             Suite 146 U.S. Courthouse
                               316 North Robert Street
24                             St. Paul, Minnesota 55101

25       Proceedings recorded by mechanical stenography;
     transcript produced by computer.

1     **P R O C E E D I N G S**

2                **IN OPEN COURT**

3              THE COURT:  Okay.  The next matter is United

4     States versus Lewis Pate.

5              Let's get everybody's appearance on the record.

6              MR. PAULSEN:  Good morning, Your Honor.  Jeff

7     Paulsen on behalf of the United States.

8              MR. OLSON:  Doug Olson on behalf of Mr. Pate.

9              THE COURT:  All right.  This is a hearing on the

10    pretrial motions.

11             First is the motion brought by the Government for

12    discovery.  Mr. Olson, your position with respect to the

13    Government's discovery motion is what?

14             MR. OLSON:  No objection to the extent it is

15    called upon by the Rules.

16             THE COURT:  That motion will be granted to the

17    extent required by the Federal Rules of Criminal Procedure.

18             Motion for 404(b) evidence will be granted to the

19    extent required by Rule 404 of the Federal Rules of

20    Evidence.

21             Motion to compel the attorney for the Government

22    to disclose evidence favorable to the Defendant will be

23    granted to the extent required by *Brady versus Maryland* and

24    its progeny.

25             Motion for discovery and inspection will be

1    granted to the extent required by the Federal Rules of

2    Criminal Procedure.

3              Motion for discovery and inspection of products

4    and records of electronic surveillance.  Was there any

5    electronic surveillance, Mr. Paulsen?

6              MR. PAULSEN:  Well, there are jail calls and there

7    are also squad videos.

8              THE COURT:  Okay.  And you have got some testimony

9    about them?

10             MR. PAULSEN:  I don't think --

11             MR. OLSON:  We are not asking for testimony on

12   those areas.

13             THE COURT:  I am sorry, this is just a motion for

14   discovery of it.  It has been disclosed.  And you have what

15   you think you are entitled to, Mr. Olson?

16             MR. OLSON:  Yes, Your Honor.

17             THE COURT:  That motion is granted to the extent

18   required by the Federal Rules of Criminal Procedure.

19             Motion for disclosure to make informant available

20   for interview, was there any informant utilized in

21   connection with this case?

22             MR. PAULSEN:  No informant in the classic sense.

23   There were eyewitnesses to a shooting.  Those have been

24   disclosed.

25             THE COURT:  Is there anything or anybody that you

1    think you are entitled to learn the identity of that you

2    don't have, Mr. Olson?

3              MR. OLSON:  No, the Government's assurances

4    satisfy that motion.

5              THE COURT:  All right.  That motion is denied as

6    moot.

7              The motion for early disclosure of Jencks Act

8    material is denied, but the Government will voluntarily

9    produce it five days before trial; is that correct?

10             MR. PAULSEN:  Sure.  Most of it is already out, if

11   not all of it.

12             THE COURT:  Motion for government agents to retain

13   rough notes will be granted.

14             Motion for discovery of experts under Rule 16 will

15   be granted to the extent required by Federal Rule of

16   Criminal Procedure 16.  And we will order that those

17   disclosures be made on or before June 25th.

18             Motion to suppress evidence obtained as a result

19   of search and seizure, is there some testimony or evidence

20   on that issue?

21             MR. PAULSEN:  Yes, Your Honor.

22             THE COURT:  Okay.  Motion to suppress eyewitness

23   identification, were there any identification procedures

24   employed?

25             MR. PAULSEN:  There will be a witness on that.

1          THE COURT:  Motion to suppress statements,

2     admissions and answers.  Did the Defendant make any

3     statements?

4          MR. PAULSEN:  Yes, and I have a witness on that.

5          THE COURT:  Okay.  And there is a motion to

6     continue the trial date.  Do you want to tell me about that,

7     Mr. Olson?

8          MR. OLSON:  I need additional time to complete

9     investigation and provide effective assistance of counsel to

10    my client.  And I am also going to be gone on July 6th.  So,

11    I am going to take -- what I am going to do is I am going to

12    take that up with Judge Montgomery and file a supplemental

13    affidavit on the exclusion of -- a fact statement excluding

14    some time under the Speedy Trial Act.  I intend to do that.

15    If I don't do it today, I will do it tomorrow.  I am

16    assuming I should take that up with Judge Montgomery?

17         THE COURT:  I think I can handle that.  My staff

18    has been in contact with Judge Montgomery's staff.  What are

19    you looking for?  Do you have a date in mind?

20         MR. OLSON:  Well, minimally into August, my

21    preference would be to do it in September, but I have two --

22    I have two primary concerns.  I am going to be gone, here

23    and through -- July is a bad month for me.  I am going to be

24    gone July 6th.  I am coming back the 7th, but that doesn't

25    help.  August is better, but September probably would be

1    preferable.  And the other dynamic, here, this is a little

2    bit of a complicated, factually-complicated situation from

3    the defense perspective.  There is a number of witnesses,

4    there's running around, there's some shooting in an alley

5    going back and forth, and there's a lot of things.

6           We are working on the investigation, but I do need

7    some amount of time to contact people and interview people

8    and put this investigative piece together.

9           THE COURT:  Why don't you file today your

10   statement of facts that would support an exclusion of time

11   under the Speedy Trial Act?

12          MR. OLSON:  And I can do that.  Mr. Pate is in the

13   building, so I can get him to sign that.

14          THE COURT:  Then I will give you a new date.  My

15   guess is it is going to be in August, not September.

16          MR. OLSON:  We can work around that.

17          THE COURT:  First of all, I'm sorry, Mr. Paulsen,

18   any objection to this?

19          MR. PAULSEN:  No objection.  If I can just weigh

20   in on the timing?  May I consult with the key witness?  I am

21   told that the last two weeks of August are not good for one

22   of my key witnesses.

23          THE COURT:  Okay.  I will work around it.

24          MR. OLSON:  So, I will identify what I perceive as

25   any time problems in that August time frame.  I think August

 1    is generally good.  I think the beginning of -- the first

 2    week of August is out of town, but I will identify that and

 3    we will see if we can work around that.

 4                THE COURT:  All right.  Is there anything else

 5    with respect to any of these motions except for the

 6    testimony?  Mr. Olson?

 7                MR. OLSON:  With respect to 404(b), I would ask

 8    that the Court put some specific time in terms of them

 9    disclosing that.

10                THE COURT:  That would be the same June 25th date

11    that I set for the --

12                MR. OLSON:  -- experts?  Thank you.

13                THE COURT:  All right.  Mr. Paulsen, do you want

14    to call your witnesses?  How many do you have?

15                MR. PAULSEN:  Two.

16                THE COURT:  Okay.

17                MR. PAULSEN:  First one is Sergeant Don Benner.

18                THE COURT:  Mr. Benner, do you want to come

19    forward, please, sir?  Raise your right hand?

20                (Witness sworn.)

21                Have a seat.  State your name, and spell your last

22    name for the court reporter, please?

23                THE WITNESS:  Don Arthur Benner, B-e-n-n-e-r.

24                THE COURT:  Mr. Paulsen?

25

**DON BENNER**

**DIRECT EXAMINATION**

BY MR. PAULSEN:

Q.  Sergeant Don Benner, by whom are you employed?

A.  I am employed with the city of St. Paul.

Q.  For how long?

A.  22 years.

Q.  And were you one of the officers that personally investigated this Lewis Pate matter?

A.  I am.

Q.  We are going to be talking about an arrest and a subsequent search warrant on March 20th of this year.  About what time -- what first brought this case to your attention?

A.  What first brought it to my attention was the monitoring of a radio call.  What I mean by radio call, the dispatch on the city of St. Paul East Side dispatched a call to the 900 block of Minnehaha, shots fired in the city of St. Paul.

Q.  And were you already enroute to some other location in St. Paul at that time?

A.  Yes, I was actually patrolling -- or not patrolling, I was actually on my way to an area on the East Side of St. Paul.  I was close to the area when the call came out.

Q.  Where were you headed?

A.  I was actually headed to XXX XXXXXXXX.

Q.  And that, coincidently, is going to turn out to be the

1    house where the Defendant is arrested and the house that

2    gets searched?

3    A.  Correct.

4    Q.  But you were going there for some other purpose at that

5    time?

6    A.  Yes.

7    Q.  What was that other purpose?

8    A.  That was to speak to a young lady that lived there by

9    the name of Morgan Navarro.

10   Q.  Was that about an unrelated matter?

11   A.  Yes, it is.

12   Q.  So when this shots fired call came in, it happened to be

13   in the same area?

14   A.  Correct.

15   Q.  In fact, I have a little map, here.  If I can approach,

16   Your Honor?

17              THE COURT:  Sure.

18              MR. PAULSEN:  This isn't marked as an exhibit,

19   although I can.  It is for demonstrative purposes.  And I

20   have a copy for the Court and Counsel.  You don't have an

21   elmo, so --

22              THE COURT:  Oh, I do, actually.

23              MR. PAULSEN:  You do?

24              THE COURT:  If you pull out -- it is brand new.

25   Go to the podium.  Do you see the little loops on the side?

1    Other side.  Little metal things?  Pull those out.

2              MR. PAULSEN:  Oh.  Do you know how to do it?

3    There we go.  Do you know how to turn it on?

4              (Discussion off the record.)

5              THE COURT:  I think there is still a lens cap on

6    the camera.

7              MR. PAULSEN:  Well, it is on mine.  I don't know

8    if it is on anybody else's.

9              MR. OLSON:  Do I have to turn my screen on to get

10   this?

11             THE COURT:  Okay, I have got it.  Do you have it,

12   Mr. Olson?

13             MR. OLSON:  I don't.

14             THE COURT:  Is your screen on?

15             MR. OLSON:  No.

16             THE COURT:  Hit the power button on the screen.

17             MR. OLSON:  There we go.

18             THE COURT:  Everybody up and running?  Witness, do

19   you have a screen yet?

20             THE WITNESS:  I do.

21   BY MR. PAULSEN:

22   Q.  So, what time of day was the shots fired call on March

23   20th?

24   A.  2:30 in the afternoon.

25   Q.  Where was the location of the reported shots fired?

1    A.  The original call came in, I believe at 988 Reaney.

2    Q.  So, that is up near -- the top of this diagram is north,

3    I take it?

4    A.  It is.

5    Q.  And so, that is near the top of the diagram.  Where did

6    you go?

7    A.  Well, when the call came out, there was a report about

8    multiple callers were calling in about several -- I believe

9    there were up to three people shooting and they were

10   shooting back and forth at each other.  The information that

11   came out over the radio, that the suspects were seen running

12   southbound.

13           So, when I responded to the area, I believe I

14   first went down around Bush to Cypress.  And then southbound

15   Cypress, just checking the area for possible suspects and

16   which way they ran.

17   Q.  And did you end up at a particular location?

18   A.  Yes.  There is another officer, Officer Chris Burns, who

19   is a patrol officer on the East Side.  He ends up checking

20   out with an individual behind XXX XXXXXXXX, at which time I

21   continued down Cypress to the front of Margaret to assist

22   Officer Burns, who was out with a possible suspect behind

23   Margaret.

24   Q.  And XXX XXXXXXXX is the house we are going to be talking

25   about here, right?

1  A.  Correct.

2  Q.  And that is the house that you coincidentally were going

3  to -- you had been there a week or so earlier?

4  A.  Yes.

5  Q.  To talk to the occupants then?

6  A.  Correct.

7  Q.  Let's talk about who the occupants of XXX XXXXXXXX were

8  back then.  Who were they?

9  A.  The homeowner is a Christine Navarro.

10  Q.  Navarro?

11  A.  Navarro.  Her roommate is an Amy Navarro, not related.

12  They share the same husband, or at the time.  And then their

13  children, meaning Amy has children that live there, and also

14  Christine.

15  Q.  Did this Defendant Lewis Pate live at XXX XXXXXXXX at

16  the time in question?

17  A.  No, he did not.

18  Q.  And do you have any information that he was even so much

19  as an overnight guest there at the time in question?

20  A.  No, I do not.

21  Q.  So, let's get back to what you did when you arrived at

22  XXX XXXXXXXX.  Was there more information coming in about

23  what had happened and where people had fled?

24  A.  Correct.  The radio was being continuously updated on

25  possible suspects and descriptions.  As I said, there were

1   several people that were calling in and the dispatcher was

2   trying to update the squads that were out there on the

3   information.

4           As I said, Officer Burns was out in the -- behind

5   the home with a green Saturn vehicle and a male occupant of

6   the Saturn.  As he was investigating, he informed me that

7   there was a female that was also associated with the vehicle

8   that had went inside XXX XXXXXXXX.

9   Q.  Now, that individual at the back of XXX XXXXXXXX is not

10  this Defendant, is it?

11  A.  Correct, it is not.

12  Q.  Was there a description aired of somebody who did match

13  the description of this Defendant?

14  A.  Yes.

15  Q.  Tell us about that.

16  A.  There was a description of a male that was seen running

17  that was wearing dark colored jeans and a dark hooded

18  sweatshirt, or sweatshirt.  He was about five-six, running

19  in the southbound direction.

20  Q.  And that person had been seen by whom?

21  A.  I believe it was an individual by the last name of

22  Klatt.

23  Q.  And had Mr. Klatt seen what this individual had done

24  vis-à-vis the shooting?

25  A.  I believe so.

1   Q.  What did Mr. Klatt say this person had done?

2   A.  I believe Mr. Klatt had stated that this individual was

3   being chased by two individuals.  And Mr. Klatt saw this

4   individual turn and fire back at the individuals that were

5   running at him.  And then he turned and ran south as the

6   other two went northbound.

7   Q.  And then did you learn anything while you were still at

8   XXX XXXXXXXX about a dog tracking?

9   A.  Yes.  When we were at XXX XXXXXXXX, as I said, Officer

10  Burns was out back.  He informed me that an individual went

11  into the house, at which time I went to the front of the

12  house to make contact with the occupants of the house.

13          When I knocked on the door, Amy Navarro answered

14  the door.  And while I was speaking to Amy Navarro, I

15  explained to her why we were there, why I had concerns that

16  a possible suspect was in her home.  That is when I observed

17  the canine officer who was on a track, a track up to the

18  front of XXX XXXXXXXX.

19  Q.  Now, this canine officer was tracking which suspect?

20  A.  The canine suspect -- or the canine officer was tracking

21  a scent from the scene of where I believe Klatt last said

22  that the -- where he had last seen one of the suspects.  So,

23  it is my understanding the canine was tracking from where

24  Klatt had last described where he saw a suspect.

25  Q.  So, that was the lone suspect who had run south?

1    A.  Correct.

2    Q.  So, this dog arrived at XXX XXXXXXXX?

3    A.  It did.

4    Q.  And what did you learn about the results of the track?

5    A.  I learned that the officer stated, the canine officer

6    stated that she lost the scent trail in the area of XXX

7    XXXXXXXX near the front of XXX XXXXXXXX.

8    Q.  Right about where you were standing?

9    A.  Correct.

10   Q.  Did you try to -- was it Amy Navarro you were talking

11   to?

12   A.  Yes.

13   Q.  Did you try to -- get her to let you in to look around?

14   A.  I did.

15   Q.  What was her response?

16   A.  Her response was that she didn't want to let us in

17   without talking to the homeowner, which was Christine

18   Navarro.

19   Q.  What did she try to do then?

20   A.  She attempted to call Christine several times on the

21   cell phone to make contact with her to explain to her that

22   the police were at their front door and what we were

23   requesting and why we were requesting to enter her home.

24   Q.  What did she say about whether there was anybody else in

25   there with her?

1    A.  She stated -- she told me that only the children were in

2    the house and there were no males that were in the home.

3    Q.  Did you have any reason to doubt that?

4    A.  Yes, I did.

5    Q.  What was that?

6    A.  Well, previously, a week earlier, as I stated before, we

7    had visited that home.  And I spoke to Amy Navarro, myself

8    and two other officers.  At that time she had opened the

9    door, allowed us in, was very cooperative.

10          At this time she seemed as though she was hiding

11   something.  She appeared very nervous.  And it was just a

12   different demeanor.  At that point, the prior week that we

13   were there, we were looking for a suspect by the name of

14   Leon Franklin with a very violent history who had assaulted

15   Christine Navarro numerous times.  He was out, wanted on

16   outstanding warrants at that time.  And I asked her several

17   times if Leon was in the house.  She assured me that he

18   wasn't, but just the way she responded, you could tell she

19   was trying to conceal something at that point.

20   Q.  Was there another piece of information that came to

21   light while you were still standing at the front of XXX

22   XXXXXXXX?

23   A.  Correct.  While I was explaining this to her and she was

24   attempting to wait for -- to get ahold of Christine,

25   information -- an officer came up to me and stated that

1    dispatch had just aired that a witness had actually seen one

2    of the shooters run into XXX XXXXXXXX.

3    Q.  Okay.  What did you do at that point?

4    A.  At that point, with the dog, with the canine losing its

5    track at XXX XXXXXXXX and the information that one of the

6    shooters was possibly seen running into there, I ordered Amy

7    Navarro and her children out of the house so that we could

8    do a protective sweep of the home to see if one of the

9    shooters was actually inside of the home.

10   Q.  What did that protective sweep involve?

11   A.  It involved removing all occupants out of the home.  It

12   was to involve briefing officers with, along with the canine

13   officer, to clear the house because of the weapon that was

14   involved.  Once all of the individuals were out of the

15   house --

16   Q.  Let's take it one step at a time.  When you ordered Amy

17   Navarro and the children out, did they comply?

18   A.  Yes, they did.

19   Q.  And it was her and how many kids?

20   A.  Two.

21   Q.  Was there another woman?

22   A.  She had -- she being Fabre White, was the other woman

23   who had been the occupant of the car that had been parked

24   out back and ended up leaving out the back door prior to

25   us --

1    Q.  Okay.

2    A.  Prior to this.

3    Q.  So, the two females and the two children were ordered

4    out and they did comply, is that right?

5    A.  One female and two children, correct.  The other female

6    had already exited at that time.

7    Q.  Then did you bring a dog to the threshold?

8    A.  I did.

9    Q.  And what did you do with respect to announcing anything

10   into the house?

11   A.  Actually, prior to making the announcement, I am sure

12   the individual heard that there was a dog that was out

13   front.  Prior to us making the announcement, the

14   individual -- a voice was heard upstairs saying, I am up

15   here.  I am coming down.

16          And from the downstairs of the residence, Lewis

17   Pate was walking down the stairs with his hands up saying,

18   coming down the stairs.

19   Q.  So, he voluntarily came down the stairs.  No one went in

20   there to the house and pulled him out?

21   A.  Correct.

22   Q.  And as he is coming down the stairs, was he saying

23   anything?

24   A.  Yes.  He was stating that -- he said, I am the guy that

25   they were shooting at.  He made a statement that he was the

1    victim.  He was being shot at.

2    Q.  Did anybody ask him any questions to elicit that

3    response?

4    A.  No, they did not.

5    Q.  And were you familiar with Lewis Pate?

6    A.  Yes.

7    Q.  Had you had prior dealings with him?

8    A.  I have.

9    Q.  So you recognized him?

10   A.  Yes.

11   Q.  Was he taken into custody at that point?

12   A.  He was.

13   Q.  For what reasons?  Were there more than one reason?

14   A.  Yes.

15   Q.  What was the first reason?

16   A.  The first reason was he had multiple warrants, traffic

17   warrants that I was aware of prior to that day, and also

18   that I believe he was one of the suspects involved in this

19   aggravated assault that happened in the neighborhood just

20   minutes prior.

21   Q.  So, let's take those one at a time.  How many arrest

22   warrants were out for him on that day?

23   A.  Off the top of my head, I believe there's at least

24   three.

25   Q.  So, he was arrested first on those warrants?

1    A.  Correct, yes.

2    Q.  And then you said he was also arrested probable cause

3    for being involved in the shooting?

4    A.  Yes.

5    Q.  You had a description of one of the shooters as -- what?

6    I think you said five-six to five-eight, thin build?

7    A.  Correct.

8    Q.  How does that compare to this Defendant?

9    A.  It fits the description of the Defendant, height,

10   weight, all over.  When he came down the stairs he was

11   wearing a white t-shirt and he had dark colored jeans.  So,

12   he just didn't have the dark top on.

13   Q.  The witness had reported a -- what was it, a black

14   sweatshirt and darker pants?

15   A.  Correct.

16   Q.  And he wasn't wearing a black sweatshirt at this point?

17   A.  Correct.

18   Q.  He had a white t-shirt on?

19   A.  Correct.

20   Q.  So, was he put in a squad car, temporarily?

21   A.  He was.

22   Q.  Then was there one other thing done to try to confirm

23   whether or not he was one of the shooters?

24   A.  Correct.  An eyewitness was brought back to -- or was

25   brought to XXX XXXXXXXX to do an on-scene showup.

1   Q.  Was that Mr. Klatt?

2   A.  I believe so.

3   Q.  And we will get into that with the other witness, but to

4   your understanding what were the results of that showup?

5   A.  That the witness identified Mr. Pate as being involved

6   as one of the shooters.

7   Q.  And was Mr. Pate then arrested and taken to the station?

8   A.  He was.

9   Q.  And during a search down at the station, are you aware

10  of anything that was found in his pants pockets?

11  A.  Yes.  A pair of cloth gloves, gloves were recovered from

12  his back pocket.

13  Q.  And is there a term on the street for those?

14  A.  Commonly referred to as brownies.

15  Q.  And in your experience, doing these types of

16  investigations, what are brownies?

17  A.  Brownies are cloth gloves, inexpensive,

18  easily-disposable gloves that a lot of suspects use when

19  they are involved in shooting, so that they don't leave DNA

20  or fingerprints on firearms.

21  Q.  So then did you apply for a state search warrant to

22  search XXX XXXXXXXX?

23  A.  I did.

24  Q.  And there was no gun recovered on Mr. Pate, is that

25  right?

1    A.  Correct.

2    Q.  So, was this search warrant primarily to look for the

3    gun?

4    A.  Yes.

5             MR. PAULSEN:  At this time I would offer

6    Government Exhibit 1, Your Honor.

7             MR. OLSON:  No objection.

8             THE COURT:  Exhibit 1 will be received.  What is

9    it?  This is the search warrant?

10            (Government's Exhibit 1 was received in evidence.)

11            MR. PAULSEN:  This is the search warrant for XXX

12   XXXXXXXX in St. Paul.  And I have talked to Mr. Paul Olson

13   about this.  He believes it can be reviewed under the four

14   corners.

15            THE COURT:  Okay.

16   BY MR. PAULSEN:

17   Q.  Were you present for the execution of the search

18   warrant?

19   A.  I was.

20   Q.  And was there a gun found?

21   A.  There was.

22   Q.  Where was it found?

23   A.  The handgun was located in the lower level bathroom of

24   the residence, wrapped in a brown towel in the clothes

25   hamper in the bathroom.

1    Q.  And was there also a black sweatshirt found in the

2    residence?

3    A.  There was.

4    Q.  Where was the black sweatshirt found?

5    A.  I believe that was found in the living room, the

6    downstairs living room.

7    Q.  Your report says it was behind the couch by the window?

8    A.  Correct.

9    Q.  By the way, that gun, was it loaded when it was found?

10   A.  Yes, it was.

11   Q.  And it was a revolver?

12   A.  Yes.

13   Q.  Six-shot?

14   A.  Yes.

15   Q.  Were there any rounds missing from it?

16   A.  There were.

17   Q.  How many?

18   A.  I don't recall without looking at the report.

19   Q.  Now, the next day, March 21st, 2012, did you conduct an

20   interview with Mr. Pate?

21   A.  I did.

22   Q.  Where did that take place?

23   A.  The Ramsey County Law Enforcement Center.

24   Q.  Who was present?

25   A.  Myself and Special Agent Williamson, of the ATF.

1    Q.  That is Kylie Williamson here at the counsel table?

2    A.  Yes.

3    Q.  And was this an in-custody tape-recorded interview?

4    A.  It was.

5    Q.  And at the start of the interview, did you go over Mr.

6    Pate's rights with him?

7    A.  I did.

8    Q.  Did you do that using a standard St. Paul Police

9    Department form?

10   A.  I did.

11            MR. PAULSEN:  May I approach, Your Honor?

12            THE COURT:  Sure.

13   BY MR. PAULSEN:

14   Q.  Showing you Government Exhibit 2, is that the form that

15   you used?

16   A.  It is.

17            MR. PAULSEN:  I offer 2.

18            MR. OLSON:  No objection.

19            THE COURT:  Exhibit 2 will be received.

20            (Government's Exhibit 2 was received in evidence.)

21   BY MR. PAULSEN:

22   Q.  So, can you just describe how you went through this form

23   with Mr. Pate?

24   A.  Yes.  What happens, I usually come in and I introduce

25   myself to Mr. Pate, even though he knows who I am.  I start

1    with the date and the time, and then I start from the top of

2    the form and I work my way down, asking him every question,

3    even if I knew the answer to it, such as his name.  And I

4    will ask the individual to spell his name and his birth

5    date, and then we will go through the Miranda form.

6    Q.  So, I notice here where it says address, you put NPA,

7    which stands for what?

8    A.  No permanent address.

9    Q.  At any time did Mr. Pate claim to live at XXX XXXXXXXX?

10   A.  He did not.

11   Q.  At any time did he claim that he was even an overnight

12   guest there?

13   A.  He did not.

14   Q.  And then after you got the background information, did

15   you go through these four rights that are listed on the

16   form?

17   A.  I did.

18   Q.  Did you actually read them to him and have him initial

19   them?

20   A.  I did.

21   Q.  At the end it says:  The above rights have been read to

22   me.  I initialed each paragraph to show that I understand

23   each of my rights.  I have a received a copy of this form.

24            And then is that Mr. Pate's signature?

25   A.  It is.

1    Q.  When you went through this with him, did he appear to

2    understand all of his rights?

3    A.  He did.

4    Q.  And at the end of going through the rights and signing

5    the form, did he agree to talk to you?

6    A.  He did.

7    Q.  Did you make any threats to him to get him to talk to

8    you?

9    A.  I did not.

10   Q.  Did you promise him anything to get him to talk to you?

11   A.  I did not.

12   Q.  How long did the interview last?

13   A.  A little over a half-hour.

14   Q.  At any time did he ask that the interview be terminated?

15   A.  He did not.

16   Q.  At any time did he ask for a lawyer?

17   A.  He did not.

18   Q.  Did he appear to be clearheaded and able to respond to

19   your questions appropriately?

20   A.  Yes.

21   Q.  He wasn't under the influence of anything as far as you

22   could tell?

23   A.  Correct.

24   Q.  And during that interview did he make admissions about

25   his possession of that firearm?

1    A.  He did.

2    Q.  He did continue to deny that he was shooting it, but he

3    admitted that he possessed it; is that right?

4    A.  Correct.

5         MR. PAULSEN:  Your Honor, there also was a search

6    warrant for a DNA sample from the Defendant, but we have

7    agreed it is moot.  So I won't be introducing that search

8    warrant.

9         THE COURT:  Okay.

10        MR. PAULSEN:  With that I have no further

11   questions.

12        THE COURT:  All right.  Thank you.  Mr. Olson?

13                  CROSS EXAMINATION

14   BY MR. OLSON:

15   Q.  Sergeant Benner, I am Doug Olson.  I represent Mr. Pate.

16   So, this all started, actually -- so what time of day was

17   this that this all did start?

18   A.  I believe the original call was around 2:30 in the

19   afternoon.

20   Q.  So, this is kind of middle of the afternoon in East St.

21   Paul, right?

22   A.  Early afternoon, correct.

23   Q.  And is this an area that -- you have had a lot of your

24   police work has been done in this area over your 22 years?

25   A.  Some of it has been.

1   Q.  And you are familiar with the area, generally?

2   A.  I am.

3   Q.  And you were headed to XXX XXXXXXXX, just incidentally,

4   anyhow; right?

5   A.  Correct.

6   Q.  And you were going there to talk with Morgan Navarro,

7   who is one of the people that lives there?

8   A.  Yes.

9   Q.  And did that relate to this situation that was going on

10  with this other person that you had described, this Mr.

11  Franklin?

12  A.  Is this related to -- I don't understand.

13  Q.  Were you going there to ask her some questions related

14  to the matters involving Mr. Franklin?

15  A.  No, I was not.

16  Q.  What were the matters you were going there to talk with

17  her about?

18  A.  We were going there to talk to her about probation.  She

19  was on probation down in a southern county.  And I spoke to

20  her probation officer and we were working on getting her

21  probation moved up here to the Cities so that she could take

22  care of some issues that she had.

23  Q.  So, you were basically going there to assist her with

24  some other related matters?

25  A.  Correct.

1    Q.  You weren't going there to go arrest anybody?

2    A.  Correct.

3    Q.  And you had been to XXX XXXXXXXX in the past, right?

4    A.  Yes.

5    Q.  On a number of occasions, right?

6    A.  Not on a number of occasion, no.

7    Q.  Were you there sometime the previous week with respect

8    to matters involving Mr. Franklin?

9    A.  Yes.

10   Q.  And were you looking for Mr. Franklin there the week

11   before this incident?

12   A.  No.

13   Q.  Okay.  So, the week before, did you locate Mr. Franklin

14   in the house?

15   A.  No.

16   Q.  Was there a connection between Mr. Franklin and Mr.

17   Pate?

18   A.  Yes.

19   Q.  What is the connection?

20   A.  Mr. Franklin and Mr. Pate are known associates, they

21   have -- they run in the same group, same circle.  So that is

22   the association that I have through other contacts that I

23   have had through other investigations that I can put a --

24   they run in the same circles.  They associate with the same

25   individuals.

1    Q.  Has Mr. Pate been associated with XXX XXXXXXXX in the

2    past?

3    A.  I am pausing, because I want to believe that his -- Mr.

4    Pate goes by the nickname of Man Man.

5    Q.  Okay.

6    A.  And there was an incident at XXX XXXXXXXX related to

7    Leon Franklin.  And it is my recollection that they said

8    when Leon had came to the house, that they believed that the

9    other individual out in the car at the time was Man Man.

10   Q.  So, at least Man Man, who is Mr. Pate, at least had had

11   some previous connection with the residence?

12   A.  Yeah, at the time, yes.  Yes.

13   Q.  And that he was found in the house on this particular

14   day, right?

15   A.  He came out of -- yes, yes.

16   Q.  Okay.  So, you are headed to XXX XXXXXXXX -- actually,

17   what day is this?

18   A.  I believe it is a Wednesday.

19   Q.  March 20th?

20   A.  Tuesday?

21          MR. PAULSEN:  You want to know the day of the

22   week?

23          MR. OLSON:  No, no, no.

24   BY MR. OLSON:

25   Q.  So, you are headed to XXX XXXXXXXX on March 20th, and as

1    you are headed there, you are dispatched, talking about

2    multiple calls and gunshots in the neighborhood, and

3    whatnot, right?

4    A.  Yes.

5    Q.  And there is quite a bit of activity that comes in in a

6    short order as you are monitoring your police radio, right?

7    A.  Yes.

8    Q.  And there's reports of a number of people shooting guns

9    in the neighborhood, right?

10   A.  Yes.

11   Q.  And at least from the -- I am just talking about what

12   you are hearing off of dispatch, it looks like there's a

13   number of people involved, right?

14   A.  At least three.

15   Q.  At least three.  And a report of numerous gunshots being

16   fired, right?

17   A.  Yes.

18   Q.  By the time you get to XXX XXXXXXXX, is the gunshot

19   activity over with?

20   A.  Yes.

21   Q.  Did you hear any gunshots being fired, yourself?

22   A.  I did not.

23   Q.  And then when you arrived at XXX XXXXXXXX, there was

24   already -- another officer was already talking to a black

25   gentleman in the alley area, right?

1    A.  Yes.

2    Q.  And that was Officer Burns, right?

3    A.  Yes.

4    Q.  There was a green Saturn parked in the back alleyway,

5    right?

6    A.  Yes.

7    Q.  And the woman associated with the green Saturn was who?

8    A.  Fabre White.

9    Q.  And is there a connection between Fabre White and Mr.

10   Pate?

11   A.  There is.

12   Q.  What is the connection?

13   A.  She was his girlfriend at the time.

14   Q.  Were you aware of that when you arrived?

15   A.  I did -- I was.

16   Q.  And who was this other gentleman in the back alleyway?

17   A.  Jeffrey Paxton.

18   Q.  And is that -- is he associated with Mr. Pate in some

19   fashion?

20   A.  He is.

21   Q.  What is the association?

22   A.  His sister and Mr. Pate have a child together.

23   Q.  And it turns -- and Mr. Paxton, he wasn't arrested in

24   the aftermath of all of this, right?

25   A.  Correct.

1   Q.  But he was at least being either questioned or held

2   temporarily by Officer Burns when you arrived, right?

3   A.  Yes.

4   Q.  And based on your knowledge of who lives at XXX

5   XXXXXXXX, there was the -- there is Christine Navarro, Amy

6   Navarro and then these children, right?

7   A.  Yes.

8   Q.  And is Morgan Navarro one of the children or is she

9   somebody else?

10  A.  She is one of the children.

11  Q.  Okay.  And so you had heard a description aired of -- at

12  least of a male, black male that was seen running wearing

13  dark colored jeans and a dark sweatshirt, right?

14  A.  Yes.

15  Q.  And that was the description that this Mr. Klatt had

16  given some officers, right?

17  A.  Yes.

18  Q.  So, when you arrived on XXX XXXXXXXX, you approached the

19  front door, right?

20  A.  No.  When I arrived, I approached Officer Burns who was

21  out back with Jeffrey Klatt.

22  Q.  Did you go around to the front door where you met Amy

23  Navarro?

24  A.  Yes.

25  Q.  And at about that time, then, the canine officer arrived

1    on the scene?

2    A.  It still was a short time after.  It wasn't

3    simultaneously; but yes, the canine did end up coming to our

4    location.

5    Q.  And originally when you are talking with Amy Navarro,

6    were you inside of the residence or were you out on the

7    porch area?

8    A.  It was right at the threshold of her door.  One foot was

9    inside of the door so that she couldn't close it as I was

10   speaking in to her.

11   Q.  And she didn't want to let you in, but she wanted to see

12   what Christine had to say about it, right?

13   A.  Correct.

14   Q.  She couldn't get ahold of Christine, right?

15   A.  Correct.

16   Q.  And she told you that other than the children, no one

17   else was in the house, right?

18   A.  Correct.

19   Q.  Did she seem a little bit nervous as you were talking to

20   her?  Did she seem nervous when you were talking to her?

21   A.  To answer your question, yes, she did seem nervous.

22   Q.  Now, was she there a week earlier in this incident

23   involving Leon Franklin?

24   A.  She was there earlier in the week when I was there, yes.

25   Q.  So then -- now, as you are at the threshold, then, you

1    hear an additional dispatch from someone who claimed to have

2    seen one of the shooters run into XXX (SIC) XXXXXXXX, is

3    that correct?

4    A.  XXX XXXXXXXX.  And it was another officer that actually

5    told me that.  I actually did not hear that come over the

6    air.

7    Q.  So, you are talking with Amy or at least you are holding

8    the scene, and then another officer says to you, I just

9    heard a dispatch that somebody claims that they saw a

10   runner -- one of the shooters run into the house.  Does that

11   sound about right?

12   A.  That is correct.

13   Q.  And then at that point in time, then, you conduct this

14   protective sweep and you tell everybody to get out of the

15   house, right?

16   A.  Correct.

17   Q.  And when you did the protective sweep and told everybody

18   to get out of the house, Mr. Pate didn't come out at that

19   point in time; right?

20   A.  He did.  Actually, he did.

21   Q.  He did, okay.  Okay, prior -- in the course of doing the

22   quote, unquote, protective sweep, was the canine brought to

23   the threshold of the house?

24   A.  The dog was, yes.

25   Q.  And was an announcement made that you were going to

1    unleash the canine and -- right?

2    A.  The way I remember it, it was prior to the announcement

3    being made, and we were getting situated at the front door.

4    That is when Mr. Pate came from downstairs.  It was prior to

5    the canine making the announcement.

6             Once Mr. Pate was in custody and was taken out,

7    the announcement was made to make sure there was nobody else

8    hiding, or anymore children in the house before the dog was

9    sent into the house.

10   Q.  So, he didn't come down as a result of the announcement

11   that the canine was going to be unleashed?

12   A.  Correct.  I believe -- my recollection is, prior to that

13   statement being made by the handler, he came out.  And like

14   I said earlier, I am sure he was aware that there was a dog

15   there, because I am sure the dog was barking in the house --

16   and whining of the dog at that point.

17             THE COURT:  Can I interrupt for a second?

18             MR. OLSON:  Yes.

19             THE COURT:  Was this the same dog that was doing

20   the tracking earlier or a different dog?

21             THE WITNESS:  Same dog.

22             THE COURT:  Same dog.  All right.

23   BY MR. OLSON:

24   Q.  So, at a minimum, you agree that before Mr. Pate came

25   down, at least the dog had been brought up towards the

1    threshold and was whimpering and barking, right?

2    A.  Correct.

3    Q.  So, as you said on your direct, and you just said, is

4    that it would be pretty obvious to the occupant of the house

5    that there was a dog outside, right?

6    A.  Correct.

7    Q.  And of course the dog is going to be brought into the

8    house to sweep the place, right?

9    A.  Correct.

10   Q.  Kind of a common sense thing.  And so Mr. Pate comes

11   down after the dog is brought to the threshold of the house,

12   right?

13   A.  Yes.

14   Q.  And at least your recollection is that is before the,

15   quote, unquote, verbal announcement that you are going to

16   unleash the dog?

17   A.  Correct.

18   Q.  All right.  So, he comes down the stairs and says that

19   he was the guy being shot at, right?

20   A.  Yes.

21   Q.  At least from that point on and then with your other

22   discussions, he was consistent with you that he was the guy

23   being shot at and he maintained he didn't fire a gun that

24   day, right?

25   A.  Yes.

1    Q.  Now, you indicated that you had some familiarity with

2    Mr. Pate; right?

3    A.  Yes.

4    Q.  So, when you questioned him -- the following day you

5    came and you questioned him?

6    A.  Yes.

7    Q.  So, have you been involved in arresting him in the past?

8    Not quite sure about that?

9    A.  Correct.

10   Q.  At least you've had contact with him before?

11   A.  Yes, I have.

12   Q.  I mean, you recognized him, and he -- whether you knew

13   his names, he recognized you?

14   A.  Yes.

15   Q.  Seemed to?  So, when you arrived to question him the

16   next day, you at least had some history over the years,

17   right?

18   A.  Yes.

19   Q.  And he agreed to talk with you, right?

20   A.  He did.

21   Q.  He kind of wanted to clear the air and talk about how he

22   was being shot at that day, right?

23   A.  He wanted -- I was there to investigate the shooting and

24   why he was arrested.  He agreed to talk to me.

25   Q.  At least, you know, he was polite and cooperative with

1   you; right?

2   A.  To a certain extent.

3   Q.  All right.  You asked him questions and he answered the

4   questions, right?

5   A.  To a certain extent.

6   Q.  And he never lawyered up, right?

7   A.  Correct.

8   Q.  He has been through the system a few times and he didn't

9   lawyer up on you, right?

10  A.  Correct.

11  Q.  And you tape recorded that interview?

12  A.  I did.

13  Q.  Everything important end up on that tape recording that

14  he said?

15  A.  It did.

16  Q.  Okay.  So, when he came down the stairs, you arrested

17  him right on the spot, right?

18  A.  Yes.

19  Q.  And you put him in cuffs right away, right?

20  A.  I didn't, but an officer did.  Yes, he was arrested.

21  Q.  And were you already aware that he had some type of

22  traffic warrants out for him?

23  A.  Yes.

24  Q.  And then you also arrested him, probable cause suspect

25  in this afternoon shooting spree?

1    A.  Yes.

2    Q.  And were you present when this witness, Mr. Klatt,

3    identified him, Mr. Pate, during this showup?

4    A.  I was not.

5              MR. OLSON:  I have nothing further, Your Honor.

6              THE COURT:  Okay, thank you.  Anything else, Mr.

7    Paulsen?

8              MR. PAULSEN:  Yes, briefly.

9                    REDIRECT EXAMINATION

10   BY MR. PAULSEN:

11   Q.  This girlfriend of Mr. Pate's, Fabre White?

12   A.  Yes.

13   Q.  Does she live at XXX XXXXXXXX?

14   A.  She does not.

15   Q.  And focusing in on the clearing of the house, did Mr.

16   Pate come down before the dog was sent in?

17   A.  He did.

18   Q.  And did he come down before any officers entered the

19   residence?

20   A.  He did.

21   Q.  And then after he was secured, did the dog then go in to

22   make sure there was nobody else in there?

23   A.  Right.  When a dog goes in, the dog goes in on lead.  It

24   is not as though the dog was unleashed and ran through the

25   house.  The dog would go out in front of the officers to

1    make sure there was not somebody hiding in a deep corner or

2    something to help protect the officers as they at that point

3    were clearing the residence.

4    Q.  So, that is when officers first entered the residence to

5    clear it?

6    A.  Correct.

7    Q.  Was there anybody else found inside?

8    A.  No, there was not.

9    Q.  Was there any searching done for a gun or anything at

10   that point?

11   A.  No, there was not.

12   Q.  And I just reviewed your search warrant affidavit.

13   There was nothing in there about anything that might have

14   been seen during the protective sweep?

15   A.  Correct.

16           MR. PAULSEN:  No further questions.

17           THE COURT:  Were the other shooters ever

18   identified?

19           THE WITNESS:  No.

20           THE COURT:  And so then they have never been

21   apprehended?

22           THE WITNESS:  Correct.

23           THE COURT:  We don't know who they are as we sit

24   here?

25           THE WITNESS:  Correct.

1                    THE COURT:  Okay.

2                    MR. OLSON:  I just have one.

3                    THE COURT:  Go ahead.

4                         RECROSS EXAMINATION

5      BY MR. OLSON:

6      Q.  One thing I forgot to ask.  What is Mr. Pate's

7      connection, then, to the Navarros, the people that were

8      residing at XXX XXXXXXXX?

9      A.  My understanding Mr. Pate's connection to the Navarros

10     would be through Leon Franklin.

11     Q.  And Leon Franklin is -- what is his connection again to

12     the Navarros?

13     A.  Leon Franklin and Christine Navarro, boyfriend and

14     girlfriend.  Leon Franklin has been arrested and since later

15     convicted of the burglary and the assault of Christine

16     Navarro, at which time Man Man was seen in the front, in the

17     car out front of the house at the time.

18     Q.  And the Franklin arrest and robbery, that was at this

19     XXX XXXXXXXX?

20     A.  No, the assault and burglary was at XXX XXXXXXXX,

21     correct.

22     Q.  Involving Mr. Franklin?

23     A.  The crime occurred there.  Correct.  And he was

24     arrested.  He was located somewhere else at a later time.

25                    MR. OLSON:  All right, no further questions.

```
 1                THE COURT:  Thank you.  You are excused.  Thanks
 2       very much.
 3                     (Witness excused.)
 4                MR. PAULSEN:  Officer Tim Filiowich?
 5                THE COURT:  Do you want to come forward and get
 6       sworn in, please, sir?
 7                     Raise your right hand?
 8                     (Witness sworn.)
 9                THE COURT:  Have a seat.  State your name and
10       spell your last name for the court reporter, please?
11                THE WITNESS:  Officer Tim Filiowich.  Last name is
12       spelled F-i-l-i-o-w-i-c-h.
13                          TIM FILIOWICH
14                        DIRECT EXAMINATION
15       BY MR. PAULSEN:
16       Q.  Officer Filiowich, by whom are you employed?
17       A.  City of St. Paul.
18       Q.  As a police officer?
19       A.  Yes, sir.
20       Q.  How long have you been on the force?
21       A.  I was hired in April of 2011.
22       Q.  Was that your first law enforcement job?
23       A.  Yes, sir.
24       Q.  On March 20th of this year, were you on duty in uniform
25       on patrol?
```

1    A.  Yes, sir.

2    Q.  And at about 2:30 in the afternoon did you get a call to

3    go somewhere?

4    A.  Yes, I did.

5    Q.  What was the nature of the call and where did you go?

6    A.  It was a shots fired call to the area of Forest and

7    Minnehaha Avenue East.

8    Q.  And was there a particular address that you focused in

9    on?

10   A.  When I arrived on the scene, I think I was the first

11   squad arriving on Minnehaha, there.  And I was flagged down

12   at 982 Minnehaha by a gentleman that had called and was a

13   witness to the incident.

14   Q.  Is your screen on there?

15   A.  Yes, sir, it is.

16   Q.  982 Minnehaha is where I am pointing?

17   A.  Correct.

18   Q.  You were flagged down by a gentleman?

19   A.  Yes.

20   Q.  Who did that turn out to be?

21   A.  His last name is Klatt.

22   Q.  Does he live in the area?

23   A.  No, he lives in Coon Rapids.  He was there as a -- hired

24   by the owner of the house to do some contract work on the

25   house.

1    Q.   About how old a gentleman is he?

2    A.   He is maybe 50.

3    Q.   Okay.  And did he seem to be a reliable, trustworthy

4    person?

5    A.   Yeah, he seemed like a decent guy.

6    Q.   What did he tell you about what he had seen?

7    A.   He said he was in the alley grabbing something out of

8    his vehicle, which is his truck.  The vehicle was parked

9    facing east, so he was looking east into the back end of the

10   truck.

11        He said he heard three, four gunshots, or what

12   sounded like pop, pop, pop to the west.  He turned around,

13   saw two black males.  And one black male appeared to be --

14   one was running and it seemed like two were chasing after

15   him.  And he said the one that was running away from the two

16   had a gun in his hand.  Turned back, fired one round, turned

17   back towards Klatt, saw him standing there, and ran south,

18   then.

19   Q.   The one that you just mentioned who fired back at the

20   other guys?

21   A.   -- two?

22   Q.   And ran south?

23   A.   Correct, yes.

24   Q.   Does that turn out to be the guy that is later

25   identified as Mr. Pate?

1    A.  Yes, sir.

2    Q.  Let's focus on that person.

3    A.  Okay.

4    Q.  I will call him the single black male.

5    A.  Yes.

6    Q.  How far was Mr. Klatt from the single black male when he

7    saw the black male?

8    A.  I would estimate about 75 feet.

9    Q.  He did say he saw him fire a round?

10   A.  Yes.

11   Q.  How good a look did he get at the suspect at that point?

12   A.  He said after he fired the round, he turned and they

13   looked at each other in the face.  And that is when the

14   single black male turned south.  He said he got a pretty

15   good look at him when he looked at him.

16   Q.  Did he say whether or not he thought he could identify

17   him?

18   A.  He did say he could identify him, yes.

19   Q.  All right.  What did you do after this initial contact

20   with Mr. Klatt?

21   A.  At that time, Canine Officer Rasmussen and Officer

22   Baudette arrived on scene --

23   Q.  Let me stop you there.  I forgot to ask you this.  How

24   did he describe this person he had seen in the alley, the

25   single black male?

1   A.  He described him as shorter, five-six to five-eight,

2   thin build, wearing, I believe, a black sweatshirt and dark

3   jeans.

4   Q.  And did you air that description of a possible suspect?

5   A.  I can't recall 100 percent, but it is protocol.  I

6   imagine I did, yes.

7   Q.  And then what did you do after getting this information

8   from Mr. Klatt?

9   A.  At that time, like I said, Officer Rasmussen, who was a

10  canine handler arrived on the scene and Officer Baudette

11  arrived on scene.  We went to the -- Klatt showed us the

12  last location that he saw the suspect.  We started a canine

13  track at that location and went south, and ended up at the

14  rear of XXX XXXXXXXX.

15  Q.  So, this canine was tracking the single black male?

16  A.  Correct.

17  Q.  That Klatt had described?

18  A.  Yes.

19  Q.  And it ended up at XXX XXXXXXXX?

20  A.  Yes.

21  Q.  That is where the trail ended?

22  A.  Yes.

23  Q.  So, were you at XXX XXXXXXXX when the suspect Mr. Pate

24  came out of the house?

25  A.  Yes, I was there.  They requested a uniformed officer at

 1    the front of the residence.  We went there, entered, myself,

 2    Sergeant Benner, Officer Baudette and Officer Mark Nelson

 3    and Canine Handler Officer Rasmussen, opened the door, went

 4    inside and announced St. Paul -- Officer Rasmussen announced

 5    canine was present, and the suspect came down the stairs and

 6    surrendered himself to Officer Nelson.

 7    Q.  Was that before any officers actually physically went

 8    upstairs or anything like that?

 9    A.  Correct.  The first thing we did was we entered the

10    door.  We were in the entryway, and just announced St. Paul

11    canine.  Come out.  And he came down the stairs.

12    Q.  And that turned out to be Mr. Pate?

13    A.  Correct.

14    Q.  After Mr. Pate was taken into custody, did you do

15    anything with respect to Mr. Klatt?

16    A.  At that time I -- well, after we cleared the house and

17    made sure it was secure, I left, went back to my squad and I

18    got officer -- or excuse me, Klatt put in my vehicle.  We

19    went back to XXXXXXXX and he identified the suspect as the

20    shooter in the alley.

21    Q.  Okay.  Let's talk about that.  When you brought Mr.

22    Klatt back to the scene, did he remain in your vehicle?

23    A.  Yes, he remained in the back seat of my vehicle.  We

24    drove down XXXXXXXX, pulled off to the side, and then

25    Officer Mark Nelson took the suspect out of the vehicle,

1    stood him in the middle of the street where Klatt could see

2    him, and did a few turns, and he ID'ed him as the suspect.

3    Q.  So, this was a one-person showup?

4    A.  Correct.

5    Q.  And it was Mr. Pate.  And Mr. Pate was in handcuffs, I

6    take it?

7    A.  Correct.

8    Q.  But, he was put out in a place where he could easily be

9    seen by Mr. Klatt?

10   A.  Yes.

11   Q.  What did Mr. Klatt tell you after he observed this

12   person?

13   A.  He identified him and said that it was the shooter.  And

14   the only note he made was that he was wearing different

15   clothes than what he saw him wearing in the alley.  He said

16   he was wearing a different top.

17   Q.  After you were done with Mr. Klatt, did you take him

18   back to where you picked him up?

19   A.  Yeah, took him back to the house, and that was that.

20           MR. PAULSEN:  No further questions.

21           THE COURT:  Mr. Olson?

22                   CROSS EXAMINATION

23   BY MR. OLSON:

24   Q.  So, Officer Filiowich, this was a one-person showup that

25   was conducted for Mr. Klatt, right?

1    A.  Correct, yes.

2    Q.  So, you got Mr. Klatt from where he was at and you

3    brought him over for the purpose of seeing if he could

4    identify the suspect, right?

5    A.  Yes.

6    Q.  And you were the person that went back and got Mr.

7    Klatt, right?

8    A.  Yes.

9    Q.  You told him that we had a suspect and you wanted to see

10   if this was the person that he saw, right?

11   A.  Yes.

12   Q.  Okay.  And so then Mr. Klatt was brought over to XXX

13   XXXXXXXX, right?

14   A.  Correct.

15   Q.  For the purpose of seeing if he could identify this

16   suspect, right?

17   A.  Yes.

18   Q.  And when you arrived, you kept -- Mr. Klatt just stayed

19   in the squad car, right?

20   A.  Yes.

21   Q.  Was he in the back of the squad car?

22   A.  Yes, he was.

23   Q.  And when you arrived at XXX, Mr. Pate was in the back of

24   somebody else's squad car, right?

25   A.  Yes, he was in the back of Officer Nelson's vehicle.

1    Q.   And he was handcuffed, right?

2    A.   Yes.

3    Q.   So, Officer Nelson, then, escorted Mr. Pate out of the

4    back of the squad car; right?

5    A.   Correct.  He opened the door and stood him up.

6    Q.   Stood him up and then he walked him over to the middle

7    of the street to get a better viewing of him, right?

8    A.   Yes.

9    Q.   Turned him around a few times?

10   A.   Yes.

11   Q.   While he was in handcuffs, right?

12   A.   Yes.

13   Q.   Cuffs in the back, I am assuming?

14   A.   Yes.

15   Q.   Spun him around a few times and that is how the

16   identification was made by Mr. Klatt, right?

17   A.   Correct, yes.

18   Q.   So, Mr. Klatt said that that is -- he identified him as

19   the shooter he had seen earlier?

20   A.   Yes.

21   Q.   Okay.  So, let's go back a little bit earlier.  You were

22   the first squad that arrived on this general scene on March

23   20th, right?

24   A.   Correct.

25   Q.   And did you get flagged down by Mr. Klatt there at 982

1    Minnehaha?

2    A.  Yeah.  I was responding to Forest and Minnehaha.  As I

3    was approaching Forest and Minnehaha, I was flagged down by

4    who I later identified as Klatt on the left-hand side of the

5    road.

6    Q.  Did he flag you down with hand signals?

7    A.  Yeah, he was standing out there with another gentleman

8    kind of waving me down.  So I pulled over on the opposing

9    side of the street and parked my vehicle there.

10   Q.  He was a contractor of some sort from Coon Rapids?

11   A.  Yeah, he was doing work for the owner of the house.  It

12   was a rental property and he was doing work on the interior,

13   I believe.

14   Q.  Is he a white gentleman?

15   A.  Yes, sir.

16   Q.  And he described what he had seen in the alley sometime

17   earlier, right?

18   A.  Yes.

19   Q.  How much time had lapsed between the time he flagged you

20   down and what had happened in the alley that he described?

21   A.  I think it was pretty fresh.  I was very close when the

22   call came out.  I was maybe a mile away.  And if I would

23   estimate, I would say seven minutes tops.  That is an

24   estimation.  I don't have the call times in front of me.

25   Q.  Was the gunshot firing over by the time you arrived in

1    the neighborhood?

2    A.  Yes, it was.

3    Q.  So, you didn't hear any of the gunshots?

4    A.  No, the gunshots were no longer happening when I was

5    there and the suspects were GOA at that time.

6    Q.  So, he described a couple of males apparently chasing

7    another male, right?

8    A.  Yeah, he said it appeared that they were chasing the

9    one, and the one fired back at them.

10   Q.  Was it two or three people chasing the single male or --

11   A.  Yeah, he said it was two.

12   Q.  Two people chasing the single black male, correct?

13   A.  Correct, yes.

14   Q.  And he described the single black male as wearing a

15   black sweatshirt, right?

16   A.  Yes.

17   Q.  And did the person have the hood on or off?

18   A.  You know, I don't know.  He did not say.

19   Q.  You don't recall if he --

20   A.  I do not recall if he said it was on or off.

21   Q.  And how about -- did he describe if the person was

22   wearing guns --

23   A.  Wearing --

24   Q.  -- wearing gloves?

25   A.  No, he did not say.

1    Q.  Okay.  And did he describe the gun that the person

2    allegedly was firing?

3    A.  I don't recall.  I did not write a report.  I don't know

4    if he mentioned a specific gun or color of the gun.

5    Q.  Okay.  And he described him as five-six or five-eight,

6    thin, black, wearing a sweatshirt and dark jeans, right?

7    A.  Correct.

8    Q.  And that at least you or somebody aired that

9    description?

10   A.  Yes.

11   Q.  Probably you, pursuant to protocol, you probably did

12   that?

13   A.  I would imagine, yeah.  I can't recall 100 percent if I

14   did, but I would imagine I did.

15   Q.  And you know that that description went out on the radio

16   because you looked at the reports and whatnot, right?

17   A.  Yes.

18   Q.  And then you -- Officer Rasmussen who is the canine

19   officer arrived at your location, right?

20   A.  Yes.

21   Q.  And then using the last location described by Mr. Klatt,

22   the canine started tracking that scent, right?

23   A.  Correct.

24   Q.  And did you stay with Rasmussen as he tracked?

25   A.  I did.  Myself and Officer Baudette went along with

 1    Officer Rasmussen on the canine track, yes.

 2    Q.  On foot?

 3    A.  Yes.

 4    Q.  And that got tracked to the front or the rear of XXX

 5    XXXXXXXX?

 6    A.  We ended up at the rear of XXX XXXXXXXX.

 7    Q.  And then the canine indicated that was the end of the

 8    tracking trail, so to speak?

 9    A.  Correct.

10    Q.  And then you were at the front door when the officers

11    announced that the canine was present, right?

12    A.  Yes.

13    Q.  And officers announced, "canine present," before Mr.

14    Pate came down the stairs, right?

15    A.  Yeah, I believe so.  Well, I know so.  Yes, they said

16    St. Paul Canine -- I'm not exactly sure what she said, but

17    then he came down the stairs.

18    Q.  Okay, I mean a loud announcement?

19    A.  Very loud, very loud, yeah.

20    Q.  Before you bring a dog in the house?

21    A.  Yes.

22    Q.  And in response to that Mr. Pate came down the stairs,

23    right?

24    A.  Yes.  We let him know we were coming in.  We let him

25    know we had a dog, and at that time he came down the stairs.

1    Q.  And then he was arrested after he came down the stairs,

2    right?

3    A.  Correct.

4    Q.  And cuffed and put in the back of the squad car, right?

5    A.  Yeah, it happened on the stairs.

6    Q.  And then you went to go get Mr. Klatt, then, right away?

7    A.  No.  We actually cleared the house, first.  We cleared

8    the lower level while somebody held the top, and then we

9    cleared the upstairs, as well.  Then after we cleared the

10   house, I left the scene and went and got Klatt.

11   Q.  So, how much time lapsed between the time that you

12   initially talked with Mr. Klatt and the time you did the one

13   person showup of the suspect?

14   A.  I would estimate 20 minutes.  It didn't take long to

15   track down.  There was only maybe a block, block and a half

16   away, and I am going to say about 20 minutes.

17            MR. OLSON:  Okay.  No further questions, Your

18   Honor.

19            THE COURT:  Anything else?

20            MR. PAULSEN:  Nothing further.  The Government

21   rests.

22            (Government rests.)

23            THE COURT:  I have a couple of questions, Officer.

24            When you retrieved Mr. Klatt and took him back to

25   where Mr. Pate was in custody, do you remember what exactly

```
1    you said to him while he was looking at Mr. Pate?

2              THE WITNESS:  No, I do not recall exactly what I

3    said to him.

4              THE COURT:  Do you remember what he said precisely

5    to indicate that that was in fact the shooter that he saw?

6              THE WITNESS:  I don't exactly remember exactly

7    what he said.  I just remember him saying that it was him.

8    And the one thing that stands out at the time, he said that

9    it was him, but he was wearing a different shirt.

10             THE COURT:  All right, thank you.  You are

11   excused.  Any other witnesses?  You rest?

12             MR. PAULSEN:  I rest, Your Honor.

13             THE COURT:  Do you wish to call any witnesses, Mr.

14   Olson?

15             MR. OLSON:  No, Your Honor.

16             THE COURT:  Do you wish to be heard on any of

17   these issues?

18             MR. OLSON:  My preference would be to do some

19   briefing.  And I would ask for -- could I get to the end of

20   next week?  Either a week or next Wednesday or next Friday?

21             THE COURT:  All right.

22             MR. OLSON:  Knowing that I am going to be filing

23   my continuance update this afternoon?

24             THE COURT:  Okay.  We will order then that your

25   memo be due on or before June 22nd.  The Government response
```

1    would be due June 29, and I will take the matter under

2    advisement.

3              As I understand it, the only exhibits I have are

4    the search warrant and an advice of rights form?

5              MR. PAULSEN:  Yes, Your Honor.

6              THE COURT:  And the map that we have been looking

7    at is not an exhibit?

8              MR. PAULSEN:  I can make it one if you --

9              THE COURT:  I am just making clear what the record

10   is.

11             MR. PAULSEN:  I thought it was just for

12   demonstrative purposes.

13             THE COURT:  All right.  That is fine.  Okay.  All

14   right.  We are in recess.  We have another matter at 10:30.

15   So we will be back, actually, in like 15 minutes.  We will

16   be back at 10:35.

17             (Adjournment.)

18

19

20

21

22

23

24

25

```
1

2                              *    *    *

3

4            I, Jeanne M. Anderson, certify that the foregoing

5     is a correct transcript from the record of proceedings in

6     the above-entitled matter.

7

8

9                      Certified by:   s/ Jeanne M. Anderson
                                       Jeanne M. Anderson, RMR-RPR
10                                     Official Court Reporter

11

12                         I N D E X

13

14    Government's Witnesses:

15

16        DON BENNER

17

18            Direct Examination by Mr. Paulsen      Page  8
              Cross Examination by Mr. Olson         Page 27
19            Redirect Examination by Mr. Paulsen    Page 40
              Recross Examination by Mr. Olson       Page 42
20

21

22    TIM FILIOWICH

23            Direct Examination by Mr. Paulsen      Page 43
              Cross Examination by Mr. Olson         Page 49
24

25    GOVERNMENT RESTS                               Page 56
```

**I N D E X**  (Continued)

**EXHIBITS**

**Government's Exhibits:**                    **Page Received:**

                    1                                  22
                    2                                  24