UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )   CRIMINAL FILE
UNITED STATES OF AMERICA      )   NO. 12-CR-113 (ADM/FLN)
                              )
          vs.                 )
                              )   Courtroom 13 West
LEWIS PATE                    )   Wednesday, August 15, 2012
                              )   Minneapolis, Minnesota
------------------------------------------------------------

**JURY TRIAL PROCEEDINGS**


**VOLUME III**


BEFORE THE HONORABLE ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE
AND A JURY


**A P P E A R A N C E S:**


For the Government:     **OFFICE OF THE U.S. ATTORNEY**
                        By:  JEFFREY S. PAULSEN
                             Assistant U.S. Attorney
                        600 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415


For the Defendant:      **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
                        By:  DOUGLAS OLSON
                             Assistant Federal Defender
                        107 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55402


Court Reporter:         **TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
                        Official Court Reporter - U.S.D.C.
                        1005 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415
                        612.664.5108

1       (9:30 a.m.)

2                    **P R O C E E D I N G S**

3                      **IN OPEN COURT**

4       (Defendant present)

5       (Without the jury)

6            THE COURT:  Good morning.  Please be seated.

7            The record should reflect we are outside the

8    presence of the jury.

9            The evidence concluded yesterday in this matter.

10   Counsel should have both been provided a copy of the Court's

11   proposed set of jury instructions, which are 30 pages, 26 in

12   number.

13           Forrest, we didn't talk about the special verdict

14   form, but it will be very straightforward, but we need to do

15   that.

16       (Discussion off the record between the Court and

17        clerk)

18           THE COURT:  There are 24 instructions and I think

19   you would probably have 28 pages of instructions, is that

20   right?

21           MR. PAULSEN:  Yeah, 28.

22           THE COURT:  I have a couple other little things

23   that I add on that aren't in the standard set.

24           Does the Government wish to note for the record

25   any objections to the Court's proposed instructions?

1           MR. PAULSEN:  No, your Honor.  They're fine.

2           THE COURT:  All right.  Does the defense,

3      Mr. Olson?

4           MR. OLSON:  No, your Honor.  They're fine.

5           THE COURT:  I think for purposes of the record we

6      should indicate -- do you know the number of the instruction

7      with regard to the --

8           THE CLERK:  Fourteen.

9           THE COURT:  Instruction No. 14 has the Court

10     giving the instruction with regard to the fact that Mr. Pate

11     did not testify and not to draw any inference from that, and

12     I take it that you affirmatively request that be included in

13     the set of instructions, Mr. Olson?

14          MR. OLSON:  Yes.

15          THE COURT:  All right.  So noted.

16          We will draw up a special verdict form which will

17     simply say the count, guilty or not guilty, and make sure

18     you have an opportunity to see that.  Otherwise, I think

19     we're ready to begin arguments at 10:00 o'clock.

20          MR. PAULSEN:  Right.  And there's a forfeiture

21     allegation in the indictment.  It's moot.  There's going to

22     be no claim to the gun, win or lose here.

23          THE COURT:  All right.  Any other loose ends that

24     need to be addressed?

25          MR. OLSON:  No, your Honor.

 1          THE COURT:  Okay.  We'll get going sharply at

 2     10:00 o'clock.  I don't know the status of the jury yet, but

 3     I've been hearing them come in, so I think we'll hopefully

 4     have everybody right at 10:00.

 5          Thank you.  Court will be in recess till

 6     10:00 a.m.

 7          (Recess taken at 9:45 a.m.)

 8                              * * * * *

 9          (10:06 a.m.)

10                         IN OPEN COURT

11          (Jury enters)

12          THE COURT:  Good morning.  Please be seated.

13          As I told you when we adjourned yesterday, the

14     evidence in this case is completed.  We're going to begin

15     this morning with the closing arguments of counsel.  The

16     first argument will be given by Assistant United States

17     Attorney Jeffrey Paulsen on behalf of his client, the United

18     States.

19          Mr. Paulsen?

20                **GOVERNMENT'S CLOSING ARGUMENT**

21          MR. PAULSEN:  As I told you when we started this

22     case on Monday, it's a simple case because there's just one

23     question you're going to have to decide:  Did the defendant

24     (indicating) on March 20, 2012 possess Government Exhibit 1,

25     the Enfield revolver.  That's the only issue, did he possess

1   it.  The question is not did he shoot the gun that day.  The

2   question is not did he assault someone with the gun that

3   day.  The question is not even where did he get the gun, who

4   did get it from.  You're not going to have to answer those

5   questions.  The only question you're going to have to answer

6   is did he possess the gun on the day in question because

7   that's what he's charged with, being a felon in possession

8   of a firearm.

9           And Judge Montgomery is going to tell you that

10  there are three simple elements to that crime, three things

11  the Government has to prove beyond a reasonable doubt.

12          The first one, that the defendant --

13          THE COURT:  I guess we don't have the monitors on,

14  so let me get those on for you.

15      (Pause)

16          THE COURT:  We set?  Thank you for letting me

17  know.

18          MR. PAULSEN:  Three elements:  One, the defendant

19  on the day in question had been convicted of a crime

20  punishable by imprisonment for more than one year.

21          She goes on to tell you:  "You are instructed that

22  the Government and Lewis Pate have agreed that Lewis Pate

23  has been convicted of a crime punishable by imprisonment for

24  more than one year under the laws of Minnesota, and you must

25  consider the first element as proven."

1          And we'll come back to element two.

2          Element three, the firearm was transported across

3     a state or international line at some time during or before

4     the defendant's possession of it.  I don't think there's

5     going to be any dispute about that.  You heard from the

6     expert yesterday about how the gun was manufactured in

7     England back in the pre-World War II era and ended up in

8     Minnesota.  The judge is going to tell you that:  "If you

9     have found beyond a reasonable doubt that the firearm in

10    question was manufactured in a state or country other than

11    Minnesota and that the defendant possessed that firearm in

12    the state of Minnesota, then you may, but are not required

13    to, find that it was transported across a state line."

14         So, that leaves element two, the defendant

15    knowingly possessed a firearm, the one in question, on the

16    day in question.

17         So how do we know he did that?  Well, some of the

18    best evidence comes out of his own mouth.

19         There's a few things that we know right off the

20    bat.  We know that Mr. Pate was arrested inside of XXX

21    XXXXXXXX on the day in question.  We know that that gun,

22    Exhibit 1, was found inside of XXX XXXXXXXX on the day in

23    question.  And the evidence is going to show that I'm going

24    to go through in a minute that it is his gun, he admitted

25    it's his gun, and he knew that it was in XXX XXXXXXX.  So,

1    let's go through the evidence that shows those things.

2            First you have -- the first jail call was to that

3    girlfriend Vanessa, and he tells Vanessa -- and this is at

4    7:20 p.m.  He tells Vanessa:  "Well, I just need you to go

5    over there and get my money."  And you know because you've

6    heard these calls that "money" is code for "gun."  And whose

7    money is it?  "My money," Mr. Pate says.  Not somebody

8    else's money.  It's "my money."

9            And to make sure she understands what he's talking

10   about is not really money, he goes on to tell her:  "Yeah.

11   They tryin' to charge me wit' a firearm ....  You feel what

12   I'm sayin'?"  So, she gets it.  She knows he's talking about

13   a gun.

14           And you know she knows -- you can tell she knows

15   he's talking about a gun, because later on in that same call

16   she says, talking in code:  "What happens when they find the

17   money?"  And she repeats the question:  "What happens if

18   they," meaning the police, find the, quote, unquote,

19   "money"?  He says:  "Nothin'."  Which prompts her to ask:

20   "Fingerprint?  Or clean?"  And Pate says:  "Clean."  Now,

21   you know they're talking not about money, because why would

22   anybody be worried about having their fingerprints on money,

23   so you know they're talking about a gun and it's Pate's gun,

24   Pate's gun, because he says:  "My money."  And that's not

25   the only time he'll say it.  He's going to say it to all

1    three people.

2          Next call was to Fabre, Fabre White, and remember

3    she was someone that was at XXX XXXXXXXX.  She was the one

4    at the front door with Amy, who didn't want the police to

5    come in and were telling the police that, no, there's nobody

6    in here but women and children.  There's no adult male in

7    here.

8          But this is Government Exhibit 7.  That last one

9    was Government Exhibit 6, but this is Government Exhibit 7

10   just a couple minutes later at 7:31 that night.

11         And Mr. Pate is telling her:  "'Member when I was

12   in the bathroom, right?"  And she says:  "Yeah."  And then

13   he says:  "I need you to go get it."  So he's talking about

14   something he needs out of the bathroom and you know what

15   that is.

16         That was a short call.  I think you might remember

17   it kind of got cut off, so we have another call right after

18   that one and he follows up with what he wants her to do.

19   This is Exhibit 8 now, just a few minutes later, and he's

20   telling her:  "Dude, just go back over there and go in the

21   bathroom."

22         Then we go to Government Exhibit 9.  This one is

23   about a half hour later at 8:34 p.m.  And this is

24   interesting here before we get into the other part of it.

25   Here on the phone he's coaching her.  He's telling her what

1   to say if the police come and ask her what was going on.

2   Because what he says is, he's telling her: "[S]ee, I, I

3   told them, like, man, bullshit, ain't about not'in'.

4   Mo'fucker's bustin' at us, and we tried to run up in the

5   crib, and dude was in the back.  You made it in the front,

6   and I pulled off and seen the law (UI) down the street."

7          That's what he wants her to tell the police, but

8   the problem is she says:  "Well, I'm not talkin' to nobody.

9   I told them I don't know nothin' about nothin'."  So she's

10  already given a statement to the police where she says:  "I

11  don't know nothin' about nothin'."

12         And here later on in that same call Mr. Pate is

13  obviously a little worried.  He says:  "You is my baby,

14  though.  Man, [] I know we gotta make it through this one,

15  'cause, uh, it might be a minute."  He says:  "It might be a

16  situation, though."  So he knows if they find the gun, he's

17  going to be in trouble and he's already kind of forewarning

18  her about that possibility.

19         But he still doesn't realize that the police have

20  already gotten the gun in the search warrant, so he repeats

21  to her in the same call -- this is Government Exhibit 9, the

22  same call.  He says -- oh, talking about Chris, "my

23  brother," talking about Chris.  And Pate asks Fabre to call

24  him:  "And tell him what the f[] happened, man, and I need

25  my money out that f[]in' bathroom.  And so White then says:

1    [S]hould I ask Chris to ... get the money out o' there?"

2    And Pate says:  "Yeah ....  I need that tonight, done

3    tonight."

4              Remember, this is the call where Fabre, unlike the

5    previous Vanessa, hasn't gotten it yet.  She thinks at this

6    point Pate might really be talking about money, so she asks:

7    "How much is in there?"  "Huh?"  She repeats:  "How much is

8    in there?"  And you remember his voice on that call?  It's

9    like he's rolling his eyes, practically, and going:  "Oh, my

10   god, dude."  "You're not listenin' [to me]."  And she says:

11   "I said how much is in the bathroom?"  And he goes:

12   "[Y]ou're not listening, though."  And then to make it real

13   clear what he's talking about:  "You know what they're

14   chargin' me for, right?"  And then she gets it.  "Yeah."

15   "Okay.  I'm listenin' now."  And once again he says:  "You

16   feel what I'm sayin'?"  Just like when he was getting the

17   message across to Vanessa about the gun?  "You feel what I'm

18   sayin'?"  Same thing here.

19             And then, of course, you know he's talking about a

20   gun because he says:  "I need that up out o' there."  White

21   says:  "How you know they didn't find it?", referring to the

22   police.  And he says:  "'Cause I ain't got charged.  That's

23   how I know.  Or they would've brought that m[]f[] down here

24   with me."

25             So, clearly talking about a gun, because if it's

1    money, you're not going to get charged; if it's a gun,

2    you're going to get charged, and he thinks they haven't

3    found it yet because I haven't been charged.

4          And then look at what he says here.  He finally

5    realizes, yeah, "We're talkin' too much on the phone" and he

6    ends the call.  Well, not before he tells her to try and do

7    that right now, "right now."

8          I forgot to mention this.  You probably noticed it

9    in that same call.  What does he say?  "I need my money out

10   of that f'in bathroom."  So again, just like Vanessa, he's

11   telling Fabre:  It's my money, my gun.

12         Then the next call was with his brother Chris and

13   tells Chris the same thing.  This is Exhibit 10.  He says --

14   still using the pretext that it's money, tells Chris:

15   "Grab, grab my li'l change, man.  Put that shit up, and ask

16   Morgan where that other shit at."

17         So he doesn't have to tell Chris to go in the

18   bathroom to find the gun, because he already did that once

19   before.  Remember on that squad video?

20         Okay.  We're at 15:32 and 52 seconds right now.

21   Watch Pate's lips move in about six seconds.

22      (Videotape played)

23         MR. PAULSEN:  He mouths the word "bathroom" to

24   Chris, who's right outside the squad car, and I'll back it

25   up so you can see it again.

 1          (Videotape played)

 2              MR. PAULSEN:  Then once again when he's talking to

 3      Chris, what does he say?  He says:  "Grab my li'l change."

 4      Not somebody's else's money or change, "my change."  He's

 5      told three people now that gun is my gun, Lewis Pate's gun.

 6              And then, of course, the next day when he knows

 7      they found the gun he tells the police the same thing, "It's

 8      my gun," and they talk about the gun about three separate

 9      times in the transcript

10              The first time is here.  Sgt. Benner, after

11      they've let Mr. Pate tell his version of what happened that

12      day out on the street, they've listened to him, and then

13      Sgt. Benner says:  "So, what about the gun?  Your DNA gonna

14      be on the gun that was in the house?"  At first Pate kind of

15      plays dumb and says:  "What gun?"  And Benner repeats the

16      question.  "You don't wanta talk about it, that's fine.  But

17      don't, don't," you know, meaning don't lie to me about it.

18              So Pate starts talking about the gun.  He says --

19      first of all, after Benner talks about:  "Is it worth it to

20      have a running gun battle in the middle o' the city durin'

21      the day?"  Pate says:  "It ain't.  Then he says:  "But I

22      ain't shoot though.  I could've, but I ain't have it on me."

23      And he doesn't deny there's a gun that belongs to him.  He

24      just claims he didn't have it on him.  He goes on to say:

25      "I couldn't make it to it."  He says:  "Yeah, if I would've

1     had it on me, yeah, it pro'ly would've been a shoot-out.

2     Pro'ly would've.  But I ain't shoot, though."

3              Then they talk about some other stuff for awhile

4     and then they come back to the gun and Sgt. Benner says:

5     "So, you wanta talk about the gun at all, where you got it

6     from, where it came from?"  Pate says:  "Here we go with

7     this shit, man," but then he answers the questions.  He

8     says:  "[B]ased on where I got it from, bought it from

9     somebody, but that was it."  "Price?"  Pate says:  "Think

10    for a hundred," hundred dollars.  Then they talk about what

11    caliber it is.  Pate claims he doesn't know what caliber it

12    is.  At the end he says:  "No.  I just bought that gun."

13             And then finally at the end Pate's telling him --

14    this is right near the end.  He's saying:  "Tellin' y'all

15    right now, all right?  Old boy," meaning Paxton, "ain't got

16    not'in' to do with this.  Ain't nobody got not'in' to do

17    wit' it, besides Fam'," meaning the other guy shot at me.

18    "I could've shot back at him, but I didn't have it on me, on

19    some real shit.  If I'd've had it on me when he was in that

20    backyard, yeah, I'd've put that nigga dick in the dirt."

21             So, he doesn't deny that was his gun.  He just

22    claims he didn't have it on him.

23             And the point is that even under his version of

24    events, he's still guilty of what he's charged with, being a

25    felon in possession of a firearm.  Like I said at the

1    beginning, we don't have to prove that he had it out on the

2    street, that he shot it at anybody.  We have to prove he

3    possessed it that day and the evidence shows he did.  But

4    even though it's not something we have to prove, let me

5    address his version of events just briefly.

6              He says it was me and Fabre in a car and there was

7    one person shooting at us while we were in a car.  Well,

8    that's not consistent with the evidence you heard, the

9    credible evidence you heard.  The first witness, Geovanny,

10   he said no.  There was three people on the street shooting

11   at each other.  There was no car involved, three people on

12   the street.

13             And another thing that disproves Pate's version of

14   the events is, if there was one guy shooting at him while

15   he's in a car, why are there two different types of casings

16   found on Minnehaha Avenue?

17             And the other reason you can tell that his version

18   of not having the gun on him and his version of the shooting

19   incident is not correct is just by the way he and Fabre

20   reacted.  I mean, supposedly, according to Mr. Pate, he and

21   Fabre have just been the victims of someone shooting at

22   them.  Okay.  How would a victim of a shooting react?  You

23   might call the police.  You might call 911.  What does Fabre

24   do?  You know, Fabre is a victim, just been shot at, and the

25   police are right there.  You'd think she'd say, "Hey, we

1    just got shot at."  What does she say?  She lies to the

2    police.  "No, nobody in here but us women and children, no

3    adult males in here.  No, no, you can't come in and look.

4    You can't come in and look."  That's not the way a victim

5    would react.  And the same goes for Mr. Pate.  I mean, if he

6    were a victim, why is he hiding?  Why doesn't he come

7    forward?

8            Now, granted, by the time he's had a chance to

9    think up a story, he's got a story and he tells it to Fabre

10   on the phone.  "This is what I want you to tell them, you

11   know, if they come to talk to you.  Tell them that we were

12   the victims."  Okay, he's got a story, but even under his

13   story, keep in mind he's still guilty as charged of what

14   he's charged with.

15           But does Mr. Pate have a motive to lie about

16   whether he had a gun on him when he was out on the street?

17   Well, of course he does.  He doesn't want to get charged

18   with aggravated assault.  That's what he's worried about.

19   That's why he asks, he asks at the start of that interview

20   with Sgt. Benner and Kylie Williamson, he says:  "Wait a

21   minute.  What am I charged with?"  And they tell him, "Well,

22   right now you're charged with aggravated assault."  So he

23   proceeds to tell them, "I didn't have a gun and I wasn't

24   shooting."  Well, of course.  He doesn't want to make

25   evidence against himself on the aggravated assault charge,

1     so he says, "I didn't have a gun.  I'm the victim."

2              So, when you consider his story, you have to

3     consider his credibility, and what do we know about

4     Mr. Pate's credibility?  Well, when he got caught, what's

5     the first thing he did?  He lied to the cops three times.

6     He lied about his name, he lied about his date of birth, and

7     he falsely told Officer Nelson, "I've never been in

8     trouble."  Well, you know that's not true.  He's got a prior

9     felony conviction.  Plus, he had all those traffic warrants

10    that day, but he says, "I've never been in trouble."

11             So, when you consider his version of what happened

12    that day, I think you have to take it with more than a grain

13    of salt, but what I'm telling you is, you can accept it all.

14    He's still guilty of what he's charged with, being a felon

15    in possession of a firearm, because when he was in XXX

16    XXXXXXXX with that gun, it was in his possession and

17    control.  And even if you believe his version that he didn't

18    have it on him, he was going there to try to get it, he'd

19    put it there earlier, he's still guilty as charged, because

20    the judge is going to tell you there's two types of

21    possession.  One type of possession is when you are actually

22    physically in possession of something, like money, okay?  I

23    got a couple dollars on me.  I'm in possession (indicating)

24    of this money.  I also have a bank account over at Wells

25    Fargo Bank, and I'm not physically in possession of that

1      money, but that's my money.  I own it and I can control it.

2      That's called constructive possession.

3              So, even if you believe that Mr. Pate's out on the

4      street, doesn't have his gun with him, his gun is back at

5      XXX XXXXXXXX, it's okay.  It's his gun, he admits it, and

6      he's in possession of it even though he's not physically

7      touching it at that point

8              So, once again, there's three simple elements we

9      have to prove.  Two of them are not in dispute.  The third

10     one, the evidence overwhelmingly shows he possessed the gun.

11     That's why I'm asking you to return a verdict of guilty on

12     the one-count indictment.

13             THE COURT:  Thank you.  We'll proceed to the

14     argument of the defense as given on Mr. Pate's behalf by his

15     counsel, Mr. Douglas Olson.

16             Mr. Olson?

17                     **DEFENDANT'S CLOSING ARGUMENT**

18             MR. OLSON:  The Government did not prove beyond a

19     reasonable doubt that Lewis Pate possessed that .38 caliber

20     revolver that was discovered in the bathroom at XXX XXXXXXXX

21     on March 20th.

22             The crime that's charged here is possession of the

23     gun.  It's not knowledge about the gun, it's not knowing

24     about the gun in the bathroom or even wanting it out of

25     here.  The question is whether the Government has proven,

1    presented proof beyond a reasonable doubt that he possessed

2    that .38 caliber revolver on March 20th.  That's where the

3    Government's proof fails.  Let's talk briefly about the

4    facts.

5          The Government after going through a lot of

6    commotion and trying to tell you that he's the shooter and

7    presenting this and that has basically given up trying to

8    prove that theory, but what we do know in terms of facts,

9    we've got a statement to the police, we've got his phone

10   calls from the jail -- we'll get into that -- and we've got

11   the rest of the witnesses' testimony.

12         But what we know at the end of the day is that

13   Mr. Pate entered XXX XXXXXXXX seconds or even

14   contemporaneously with the police being on the scene wearing

15   a white T-shirt, driving a car.  We finally established that

16   yesterday through the testimony of Mrs. Moua.  He pulls up

17   in a car, he's wearing a white T-shirt, he's not on his

18   feet, he's not wearing a hoodie, and he runs into the house,

19   and the police are there, they're on the scene.  So we're

20   talking about a guy going into a house a very short period

21   of time, and that's what the facts are.

22         He's in the house a short period of time.  There's

23   no testimony, there's no witnesses here testifying that they

24   ever saw him with a gun inside or outside the house.

25   There's no forensic evidence tying him to that gun found in

1    the bathroom, not on the gun, not on the towel, not anywhere

2    in the bathroom, not anywhere in the world of forensic

3    since.  It doesn't exist.  There's nothing tying him to that

4    gun, and that's the state of the facts.

5              And in addition, the idea that he's stashing this

6    gun at XXX XXXXXXXX, that somehow he's converted a place,

7    he's got -- there's no evidence he's got any connection.  He

8    doesn't live there, it's not his place, and so somehow the

9    Government wants you to believe that he's converted the

10   bathroom there into a stash house.  I mean, where's that

11   evidence?  Where's the evidence that he's got some

12   connection there, that he keeps his stuff there, that he's

13   got some goings-on there other than he ran into this place

14   and ran upstairs where he's found as the police arrive on

15   the doorstep?  Where's this evidence of him screwing around

16   and hiding this gun?  I mean, it just doesn't exist.  It's

17   not your duty or obligation -- it's actually contrary to

18   your duty or obligation just to fill in the facts for the

19   Government when they don't have facts to back up their

20   theory.  That's what they're asking you to do here.

21             Now, I'm going to mention this, but I'll try and

22   be brief on it, because as Mr. Paulsen has said, I mean,

23   they've given up this idea of trying to prove -- I mean,

24   he's not charged with shooting the gun.  We all know that

25   and I know that, but they certainly presented evidence

1       concerning the shooting of the gun.  Oh, the gun didn't have

2       the casings in it, doesn't match the casings, and they talk

3       about what the witness Geovanny said and this and that and

4       the other thing and they try and discredit his statement,

5       but then they've given up the idea that they know -- they

6       didn't attempt to prove that he was the shooter.  So what's

7       all that about if it doesn't matter?  They throw it out

8       there trying to suggest that, well, maybe he's the shooter.

9       Maybe he's a bad guy, maybe he isn't, maybe whatnot, but I

10      say it's all thrown out there to kind of confuse the issues,

11      prejudice Mr. Pate, think, well, maybe he's the shooter,

12      maybe he's a bad guy, when they know if this was a case

13      trying to prove an aggravated assault and he was a shooter,

14      horrible job and at the end of the day they gave it up.

15              And they could have -- if it was important to them

16      -- and you'd think it would be important to our Federal

17      Government.  They could have tried to prove that he was the

18      shooter.  Forensics, the gun shot residue test, the

19      sweatshirt.  We know that the shooter wasn't wearing a white

20      T-shirt.  He had on dark clothes, some kind of a dark hoodie

21      or something dark on him.  So why do they present this

22      evidence about this sweatshirt found behind the living room

23      couch before the window?  Why did they throw that out there

24      and why didn't we hear any talk about that?  It's because

25      there's nothing to it.  It's just a piece of evidence that

1    they throw out there just to confuse things.

2            But that sweatshirt, if it was important -- it was

3    important enough to present it, it's in evidence.  If it was

4    important enough to bring it to your attention, introduce it

5    into evidence, where's the forensic follow-up?  They could

6    have easily taken that in, taken hair samples and DNA off of

7    that piece of clothing and determine whether it was

8    Mr. Pate's or not.  Instead they just kind of throw it out

9    there.  But we know the shooter had on dark clothes, he

10   wasn't wearing a white T-shirt, and they just gave it up.

11           And as to the gunshot residue, they actually

12   tested it and then they called it off.  They took the

13   sample, didn't test it.  You could take the gunshot residue

14   off of his hands.  They did take samples off of the

15   sweatshirt, off of his T-shirt.  Where's that gunshot

16   residue evidence to prove that he was shooting a gun that

17   day?  And they just gave it up.

18           They don't test the towel in the bathroom, the

19   towel.  They don't make any attempt to try to find any

20   forensic evidence out of the rest of the house.  It just

21   doesn't exist.  And so they did a miserable job proving that

22   he was the shooter.  And I agree that that's not the crime

23   charged here.  You kind of ask the question, well, what was

24   that all about?

25           Now, the crime here charged is a crime of

1   possession.  The question is whether he possessed not some

2   other gun, not some gun, but the .38 caliber Enfield

3   British-made revolver found in the clothes basket on

4   March 20th.

5        And there are two types of possession.  There's

6   actual and constructive possession.  I'll get to

7   constructive possession a little bit later on, but that's

8   easily dispensed with.

9        But as to actual possession, the Government's

10   proof fails.  They got no witnesses that testified that he

11   had a gun.  They got no forensics.  No one inside the house

12   testified they saw him with a gun.  So what this really

13   leaves is these -- and what this case comes down to is the

14   question of the phone calls and then his statement to the

15   police.

16        Now, these phone calls, if you break it down, they

17   establish that he knows about the gun in the bathroom and he

18   wants it out of there, but that doesn't establish that he

19   put it there or that he ever possessed that gun in the

20   bathroom.  It shows that he knows there's a gun in the

21   bathroom, he wants it out of there, and as I indicated in my

22   opening statement, he wants it out of there because he

23   doesn't want to get jammed up for a gun that wasn't his.

24        And so he makes these series of calls and the

25   calls are what they are, all right?  Get it out of the

1     bathroom, even if he says, "Get my money," whatever.  He's

2     just trying to get this thing out of the bathroom.  So we've

3     established that he knows it's in the bathroom.  He wants it

4     out of there.  But that doesn't establish possession and

5     that he put it there, and that's what you have to find

6     beyond a reasonable doubt to convict Mr. Pate here, is proof

7     beyond a reasonable doubt that he put the gun in the

8     bathroom and that he possessed it.

9          And I want to be clear.  I mean, simply knowing --

10    there's nothing significant about, I mean, the fact that

11    this involves a gun.  Knowing that there's a gun in a

12    bathroom in a house that you don't live at, don't have any

13    connection to, that's not a crime.  The crime is one of

14    possession.  I mean, we all know about -- you know, I know

15    people that have guns in their house.  I don't possess them.

16    Knowing that there's a gun in a house, even if I want it out

17    of there, doesn't make you guilty of possessing it.  All it

18    means is that you have knowledge of the gun being there, but

19    it doesn't establish possession in any way, shape or form.

20    So I got to stress that just knowing that there's a gun in

21    the bathroom and wanting it out of there doesn't establish

22    possession.

23          So, those calls really don't carry the day here.

24    They don't establish proof beyond a reasonable doubt that he

25    put the gun there.  There's nothing in there about him

1    putting the gun in the bathroom, putting it in the clothes

2    hamper.  There's nothing about how, where, why it happened

3    to end up there other than he knows about it, and that's the

4    state of the evidence and it's not up to you to fill in the

5    gaps.

6            Which then leads us to his so-called confession,

7    his 45-minute statement to the police.  This 45-minute

8    statement to the police starts out, you know, he's a suspect

9    in this ag assault.  The police officer comes down and wants

10   to talk with him about what happened with the shooting and

11   they spend -- of the 45 minutes, it's 40 or so minutes

12   before there's even mention of a gun.

13           And what does he say at the end of the day?  He

14   says, "I never possessed it, never had it."  He's also

15   honest enough to say that, "Maybe if I'd had a gun I might

16   have used it," but he never possessed the gun.

17           And when it comes down to the critical fabric of

18   that statement, the officer finally, page 59 -- they'd been

19   kind of dancing around about this and then he says:  "All

20   right.  So, you wanta talk about the gun at all, where you

21   got it from, where it came from?"  Mr. Pate:  "Here we go

22   with this shit, man, based on where I got it from, bought it

23   from somebody, but that was it."  And the officer says:

24   "Hundred dollars?"  Pate mimics him:  "Think for a hundred."

25   And listen to it.  "Hundred dollars?"  He just says:  "Think

1    for a hundred."  He says:  "Based on where I got it from,

2    bought it from somebody, but that was it."  That's as much

3    detail as you can get out of Mr. Pate.  "Got it from

4    somebody."  He says:  "A hundred dollars?"  "Yeah, I think

5    for a hundred," and then he can't even tell what caliber of

6    gun this is or any other information about this gun.  Then

7    he says:  "I just bought that gun."

8            And when you break it down, that's really what

9    this supposedly reliable statement is that the Government is

10   hanging its hat on to bridge the gap to prove beyond a

11   reasonable doubt that that was his gun and that he put it in

12   the bathroom.

13           And where is the follow-up questions of Mr. Pate?

14   Where's the questions about:  "Okay.  When did you put it in

15   the bathroom?  Is this your stash house?  Did you dump it

16   off there on the day?  How did you get it in the bathroom?"

17   Where's any questioning about that?  Where's the where, the

18   when and the how.  Where's the simple follow-up questioning

19   that any police officer would naturally follow up and lead

20   into wanting to find out if this information is really

21   accurate, reliable, and can you depend on it.  No.  And it's

22   this gotcha moment at the tail end of this 45-minute

23   discussion where he gets him to say something about a gun.

24   Doesn't ask him about the .38 caliber gun in the bathroom in

25   the clothes basket, a simple question:  "How did it get in

1    the clothes basket?  Are we talking about the same thing?"

2             And it's a simple, simple thing for a police

3    officer when you take a statement -- and it doesn't matter

4    if it's a suspect, a person in custody or a witness on the

5    street.  You want to get some details and you want to follow

6    up and make sure your information is accurate and reliable

7    and you're all on the same page.  And you've got a

8    24-year-old young man.  He's in custody.  He's talking with

9    this experienced 20-plus-year veteran police officer going

10   around in circles.  He's trying to explain to him about how

11   he's being shot at that day, and that's one thing he was

12   consistent about right to the tail end.  "I was being shot

13   at.  I didn't have a gun.  I didn't shoot at anybody."  You

14   can listen to that and that's believable.

15            And so finally at the tail end of this thing he

16   gives him this vague, completely undetailed:  "All right.

17   "The gun," "gun," "hundred bucks," "got it from somebody,"

18   "don't know the caliber," "just got it," and that's about

19   it.

20            And if you as jurors are being asked to rely on

21   this to really bridge the gap to convict Mr. Pate for

22   possession of that gun, proof beyond a reasonable doubt,

23   you're entitled to have some level of detail such that you

24   can determine that this is accurate, credible and reliable,

25   and there's absolutely no effort by the police officer at

1    all.  And they say, well, yeah, what's the point at that

2    point in time, you know?  Well, I know what the point is at

3    the time.  It's the gotcha principle.  He's gotcha, all

4    right?  So then he just moves on.  He doesn't care.  He

5    doesn't want to do any follow-up, because that's easy.  I

6    mean, that's easy.  Well, easy isn't good police work and

7    it's certainly not easy on you as jurors trying to evaluate

8    the credibility and reliability of that.  But even though he

9    says he had a gun, hundred bucks, got it from somebody,

10   don't know the caliber, just got it, it ain't a confession.

11   It's not a confession to possessing that gun in the clothes

12   basket at XXX XXXXXXXX.  I don't want you to read that in

13   there and just assume, well, we're all talking about the

14   same page and make sure that, you know, Mr. Pate was talking

15   about the same thing and that he's really giving a reliable

16   statement.  Well, it's just not there.  You shouldn't read

17   into it for the Government.

18        And police statements in custody can be

19   intimidating situations and a person might just say

20   something to appease the officer and exactly what Mr. Pate

21   ends up telling the officer.  I mean, you can read right

22   into it, you can listen to it.  He's going along with it and

23   says:  "Yeah, yeah, yeah."  Then he goes right back to it

24   and he says:  "Listen, I didn't have the gun, all right?  I

25   didn't have the gun.  I didn't possess it."  Maybe he wanted

1    it, he wanted to get to it, but he never possessed the gun

2    on March 20th, and that's the case here and that's the rub

3    here.  And you can tell that he gets mad, he's frustrated,

4    and he's telling the officer, which he's been telling him

5    for most of the 40 minutes, that he never had the gun, never

6    possessed it even if he wanted it.  Never got it.

7    Everything might be different.  But it's no confession to

8    possessing the gun on March 20th, the one in the bathroom.

9    It's just not there.  Listen to his words.

10             And at the end of the day he says:  "Well" -- you

11   can tell it doesn't seem to matter to him, because he tells

12   the cop:  "Well, I'm going on a probation violation anyhow,"

13   so he's just eating the gun.  Maybe he doesn't want to get

14   anybody else in trouble.  He puts it right in there to the

15   cop.  He says:  "Well, it doesn't matter, you know, I'm kind

16   of toast anyhow."  So he explains why he would give this

17   undetailed and rather unremarkable statement to a police

18   officer, and then he goes back and says:  "Didn't have the

19   gun, didn't shoot anybody," right up to the end, which

20   incidentally is the very first thing that he reported to

21   police when the police came by him.  He did report to the

22   police.  He came down the stairs and said, "I'm the one

23   being shot at" and they arrest him.  That was his police

24   report and where did that get him?  Handcuffs and brought

25   down to the police station.

1          I'm just going to talk for a second about this

2     constructive possession doctrine, because really what the

3     Government has really been aiming at is that, you know, the

4     gun in the clothes basket is his and he put it there, okay?

5     But there is this doctrine of constructive possession and

6     you're going to get the instruction from the Court.  If you

7     have direct physical control, that's actual possession and

8     we know what that is.  But:  "A person who, although not in

9     actual possession, has both the power and the intention at a

10    given time to exercise dominion or control over a thing,

11    either directly or through another person or persons, is

12    then in constructive possession of it."

13         All right.  The person -- if you don't actually

14    have it to be in constructive possession, that means you

15    have to have the power at a given time to exercise control

16    over it, and there's absolutely no evidence at all that he

17    had the power to exercise control over the gun that was

18    found in the bathroom at XXX XXXXXXXX.  So don't make the

19    mistake of thinking because he's making phone calls from the

20    police station later on, he's trying to get this gun out of

21    the bathroom, that that's constructive possession.  He

22    doesn't have power over that gun.  I mean, he doesn't even

23    call the occupants of the house.  He's got no connection to

24    this house.  He's calling outsiders trying to get to

25    something that they clearly can't get to, so he doesn't have

1    any power to exercise control over this.  That's certainly

2    true when he's at the police station, so don't make that

3    mistake.

4            And then this idea that somehow he's got the gun

5    stashed in the bathroom and that he's trying -- he's saying,

6    "I'm trying to get to it," now, where is that evidence that

7    this is his stash house or that he's got enough connection

8    to XXX XXXXXXXX or he's running down there to get his gun

9    out of the bathroom.  Where's the evidence that he's got

10   power or control over XXX XXXXXXXX?  I mean, it just doesn't

11   exist.  There isn't any evidence about that, so you can't

12   fill in that gap.  So this constructive possession case is

13   really thin to non-existent.  The question is whether he put

14   the gun in the clothes basket and that's the evidence which

15   is missing here and certainly not proof beyond a reasonable

16   doubt.

17           Now, there's a fairly simple scenario here that

18   would account for Mr. Pate knowing about the gun in the

19   clothes basket and wanting it out of there so he doesn't get

20   jammed up with it without it being in his possession or his

21   gun.  And I want to be clear about something, is that -- and

22   you get several instructions about this.  The defense has no

23   burden of proof here, we don't have to prove anything, and

24   that's just a fundamental constitutional principle.

25           But it's easy to figure out scenarios by which

1     Mr. Pate would know that there's a gun in the bathroom.

2     Maybe he just knows that the occupants of XXX XXXXXXXX keep

3     a gun in the bathroom.

4          Maybe in the brief moments that he's running into

5     XXX XXXXXXXX from the back door and then to the upstairs

6     while the police are coming in he sees something.  He sees

7     somebody stash a gun in the bathroom.  That's hardly

8     outrageous.  Maybe while he's in there these brief moments

9     while somebody's knocking on the door somebody tells him,

10    you know, "Lewis, you got a problem in the house because

11    there's a gun in the bathroom."  Somebody tells him.  There

12    are other people in the house.

13         These are all valid, sensible scenarios which

14    could account for him knowing about the gun without having

15    to have ever possessed it or put it there.  I mean, this is

16    a place that certainly could have had a gun somewhere in the

17    house.

18         But once again, I want to stress that you can't

19    then turn this around and say, well, you know, Mr. Pate

20    didn't testify.  They didn't prove the state of his

21    knowledge.  We don't have to prove anything.  They got to

22    prove their case beyond a reasonable doubt.  They got to

23    prove that his phone calls demonstrate that he knew the gun

24    was there and he put it there, that he possessed it.

25         And so I suggest to you that he could have known

1        that there was a gun in the bathroom from several scenarios,

2        from somebody seeing it, somebody telling him.  And this

3        certainly is a house where finding -- this isn't a house

4        where it would seem to be outrageous or remarkable that

5        there might be a gun in the house.

6                You know, we heard the testimony from police

7        officers about this being a problem, trouble house, police

8        calls, a lot of activity.

9                We've got this whole piece about this Leon thing,

10       this Leon guy, his association with the house.

11               We've got the daughter Morgan, 17-year-old problem

12       child, who's got shotgun shells inside a sock, inside a

13       sock, inside a storage container up in her bedroom, and

14       what's this 17-year-old doing with shotgun shells being

15       stashed up in her bedroom?  What's that all about?  Where's

16       that follow-up investigation?  So what's going on with

17       Morgan and her problems?

18               And ask yourself:  Why is a federal ATF agent,

19       Agent Williamson, going down to interview this teenager in

20       the middle of the afternoon with a St. Paul police officer,

21       an ATF agent going to the house in the middle of the

22       afternoon?

23               So, this is a trouble house where they may just

24       happen to have a gun and it may have ended up in the

25       bathroom and Mr. Pate may have found out about it by the

1        time he's at the police station.

2              Neighbor Moua testified:  Scared of the occupants

3        of the house, problems with the house.

4              And then consider that when Mr. Pate is arrested,

5        they put Amy Navarro, the adult living in the house, in the

6        back of the squad car with him and they drive the two of

7        them down to the police station together.  Might she have

8        said something to him?

9              So, it's very plausible that he could have found

10       out about a gun in the bathroom from a number of manners and

11       that he was concerned about it enough that by the time he

12       gets down to the jail he's foolishly making these phone

13       calls which are obviously being recorded, but that is what

14       it is.  But again, that doesn't prove that just because he's

15       got the knowledge that he put the bullets -- that he put the

16       gun there or that he ever possessed it.

17             Now, I will finish up here shortly, but I've got

18       to talk about a couple of important constitutional

19       considerations for you as jurors to take into account.

20             Really, the bedrock of our criminal justice system

21       is the jury system and we trust jurors to make the correct

22       decisions.  When we put a citizen on trial in this country,

23       we don't let prosecutors, police officers or even judges

24       make those decisions.  We ask jurors to come in, take a look

25       at the evidence, and we ask the jurors because of the

1        instructions to remain skeptical, be thorough, and do not

2        convict a person unless the Government has proved its case

3        beyond a reasonable doubt, and that's fair.  I mean, that's

4        the way the system works and it's a good system, and we

5        trust jurors and we trust your collective wisdom.  But when

6        the Government fails in its proof, you shouldn't hesitate to

7        return a verdict of not guilty and you should never fill in

8        the gaps for them when they leave questions and reasonable

9        doubts in a case.

10                Mr. Pate starts off with the presumption of

11       innocence.  The presumption of innocence is in conjunction

12       with the necessity of convicting only with proof beyond a

13       reasonable doubt really two of the most important

14       constitutional individual rights that we hold, and that

15       means that you as jurors kind of have to live up to your

16       duty, which you all will, and you have to presume Mr. Pate

17       innocent.  And that means that just because he's brought

18       into trial and it's the Federal Government, they got an

19       indictment, that you're not going to hold that against him,

20       and you're going to presume him innocent until and unless

21       the Government proves its case beyond a reasonable doubt.

22       And that means when you're evaluating the evidence, it's

23       fair to say, well, yeah, but what about the presumption of

24       innocence?  Well, he made phone calls, but, you know,

25       presumption of innocence.  Maybe he just knew about it but

1    didn't possess it.  You got to apply the presumption of

2    innocence.  You've got to give it some life, life in your

3    deliberations.

4          And one way to think about the presumption of

5    innocence, it's a big shield which protects us as citizens

6    against the Government.  And the Government, you know, they

7    present evidence and they chip at the shield and they break

8    off part of the shield and they chip and they do this, but

9    as long as there's any little part of that presumption of

10   innocence left, then you must find the defendant not guilty.

11         And what all this means is that the Government, to

12   present a case with proof beyond a reasonable doubt, they

13   got to shatter that shield.  They got to blow it up.

14   They've got to overwhelm you with evidence.  They've got to

15   drive it home so that you as jurors, you don't have second

16   thoughts.

17         This is one of the most important decisions you're

18   going to ever make, certainly the most important decision

19   anyone's going to make on behalf of Mr. Pate.  You don't get

20   a chance to second-guess.  You can't call up next week and

21   say, "Well, you know, I've been thinking about it.  Maybe

22   there is something to that.  Maybe they didn't prove the

23   case beyond a reasonable doubt."  You got one shot at it.

24   You don't fill in the gaps for the Government.  It's one of

25   the most important decisions you're ever going to make here.

1           And that's why proof beyond a reasonable doubt, in

2       a sense it protects you, because you should never have

3       second thoughts.  If you've got second thoughts, that's

4       reasonable doubt, not guilty.  Simple as that.  It's for

5       your protection so that you don't have to question.  And any

6       time a jury returns a verdict of not guilty, you ought to

7       feel good about it.  The Government didn't present their

8       case.  The contrary is true.  If you start cutting gaps for

9       the Government, cutting corners, filling in the evidence for

10      them when they didn't prove the case beyond a reasonable

11      doubt, the whole system suffers.

12          Proof beyond a reasonable doubt, it is what it

13      sounds like, that you got -- it's beyond a reasonable doubt.

14      It's not up to the threshold, it's not close to it.  They

15      got to take you over and beyond a reasonable doubt.  Get all

16      the reasonable doubt out of the way so that you don't have

17      any second-guessing.

18          And I akin this sometimes to a guy who's in charge

19      of setting up the safety netting on a skyrise development,

20      and they're building and he's got to put the safety nets up

21      there.  Well, that guy in charge of the safety nets, he's

22      going to put the safety nets up there and he's going to

23      double-check them, he's going to triple-check them, and he's

24      going to back them up with a secondary device if the first

25      one fails, because people are going to die if they fall off

1    a skyrise into the safety net.  Then you're going to throw

2    some stuff into the safety net and you're going to jump into

3    it yourself.  So you're going to have that satisfaction of

4    looking at the evidence beyond a reasonable doubt to make

5    sure you're not making a mistake, and that's really what

6    it's about.  The Government's supposed to overwhelm you with

7    evidence and not leave any doubt and there's doubt left in

8    this case.

9          Before I sit down here -- I mean, there's a few

10    things that I didn't touch on here and I'll -- you know,

11    this whole squad video where his identity is -- maybe he's

12    playing games with Officer Nelson, whatever.  He says:

13    "Talk to my brother.  Talk to this other officer."  That's a

14    side show.  I mean, that's really got nothing to do with it

15    here.

16          And this bit of you being asked to be mouth

17    readers, you know, give it what weight you want, but it is

18    what it is.  But there's certainly things like that and

19    other issues that I didn't touch upon, but you're all

20    reasonable, you can understand what my position would be on

21    it.

22          So, I sit down, I don't get the last word, but if

23    there's anything I haven't touched upon, it's not that I

24    didn't think it was important.  It's just that I can't talk

25    forever up here.  So there's a few things that I didn't

1   mention, but you know what our position is going to be on

2   these things and I'd ask that you just be, you know,

3   reasonable when you consider these things because I don't

4   get the last word in here.

5          But at the end of the day there's a very simple

6   explanation for what took place with Mr. Pate and he gets

7   jammed up for a shooting that he wasn't involved in.  He

8   tells the police that right away.  He ends up at the police

9   station.  He's desperate because he knows there's a gun in

10  the bathroom.  He wants to get it out of there.  He makes

11  these calls to get it out of there, not because he possessed

12  it, not because it was his, but because he knows he's going

13  to get jammed up with it, which is exactly what's taking

14  place here.  Then he goes down the next day and he's, you

15  know, 40 minutes into explaining to this officer what

16  happened and he gets frustrated and he makes a few

17  unremarkable, undetailed statements, but he insists he

18  didn't have a gun, didn't possess it, didn't get to it,

19  didn't use it, consistently.

20         The Government hasn't proven this simple scenario,

21  his statement just at the tail end of getting through it for

22  the day and just thinking he was going to take the heat for

23  something that wasn't his.  It's certainly not a confession

24  to this .38 caliber gun and the lack of detail is only the

25  responsibility of the police officers.  You shouldn't be

1    filling in for them.

2         The Government didn't prove its case beyond a

3    reasonable doubt and therefore I'm going to ask that you

4    return a verdict of not guilty.

5         Thank you.

6         THE COURT:  Because the prosecution has the burden

7    of proof, they have the opportunity for the final word, so

8    we'll hear from Mr. Paulsen by way of a brief rebuttal

9    argument.

10             **GOVERNMENT'S CLOSING ARGUMENT IN REBUTTAL**

11        MR. PAULSEN:  Well, defense counsel is doing his

12   job and he tells you to discount the jail calls because it's

13   hypothetically possible that Mr. Pate is talking about

14   somebody else's gun.  The problem is, at the risk of

15   repeating myself, he says over and over and over on those

16   tapes:  "It's my money.  It's my money," which "money" is

17   "gun."  "It's my gun."  If he was trying to get rid of

18   somebody else's gun, number one, why would he even bother,

19   but number two, he wouldn't -- knowing he's on a recorded

20   jail phone, he wouldn't in reference to somebody else's gun

21   say, "It's my gun."  It just didn't make sense.

22        Then doing his job to try to negate the

23   confession, he suggests, well, maybe the officers

24   intimidated him.  Well, I mean, you heard that call.  It's a

25   long call -- or recorded interview.  It's a long interview.

 1    They're very polite.  They read him his rights at the

 2    beginning.  They make sure he wants to talk to them right

 3    then.  You know, they thought he might have just woken up.

 4    They make sure he's okay, they read him his rights, they let

 5    him tell his whole story about how he claims the shooting

 6    went down that day, and then at the end they ask him if he

 7    wants to talk about the gun.  I mean that's almost -- in a

 8    way it's almost an afterthought, because they already knew

 9    from listening to the jail calls that it was his gun and

10    they knew that going in.  But they ask him about the gun.

11    They didn't browbeat him, they didn't twist his arm, they

12    let him talk, and he said the things he said.  There's no

13    intimidation, there's no coercion.

14          And the reason Mr. Pate confessed to the gun is

15    because he knew they found the gun.  All he wanted to try to

16    beat was the aggravated assault and that's why he kept

17    saying over and over again, you know, "I didn't shoot.  If I

18    could have gotten to it, I would've, but I didn't have it on

19    me," because he's trying to beat the aggravated assault.  He

20    knows he's done on the felon in possession.  He doesn't even

21    fight with them on that.  And that's all he's charged with

22    here.

23          So, there's all this talk about there should have

24    been more forensics to try to prove up an aggravated assault

25    case, but we're not here on an aggravated assault case.

1     We're here on a felon in possession.  And they did the

2     forensics.  They sent the gun in for fingerprint testing.

3     There weren't any prints on it, only unidentifiable smudges.

4     They sent it in for DNA testing.  There was no useable DNA

5     on it.  Well, why weren't there any prints on it?  Well, two

6     reasons.  One, Mr. Pate had those gloves, and when you go

7     out to do a shooting, you're going to wear gloves.  You

8     don't want to leave prints on your gun.

9          Plus, when he got to XXX XXXXXXXX, where did he go

10    to hide this gun?  You think it's just a coincidence he hid

11    it in the bathroom?  No, he went to the bathroom for a

12    reason, because when you're in the bathroom, you can take

13    any empty casings and you can flush them down the toilet so

14    they won't be found, because casings, as the expert said,

15    can tie you to a crime scene.  And if you're in a bathroom

16    and if you're worried about having gunshot residue on your

17    hands, you can wash up.  In a bathroom you got a towel.  You

18    can wipe that gun clean.  And that's what Pate says on the

19    recorded call to Vanessa.  He says, "My prints won't be on

20    it.  It's clean."  How does he know it's clean?  He cleaned

21    it.

22         And most fundamentally, if it's not his gun, how

23    does he know it's hidden in the clothes hamper?  He knows

24    it's hidden in the clothes hamper because he cleaned it off

25    and he put it in the clothes hamper.

1          So, I mean, we're accused of giving up on proving

2     something we told you at the beginning we weren't even going

3     to try to prove.  We don't have the burden of proving that.

4     We brought out evidence about that shooting incident to give

5     you background and context and to explain what was going on

6     that day, but I told you from day one, you know, this is

7     felon in possession.  That's the only thing we have to

8     prove, and we have proven that.

9          As far as the hoodie behind the couch, again, it's

10    not something we have to prove, but we brought that out not

11    to prejudice Mr. Pate, but because Geovanny said there were

12    two men wearing hoodies that were shooting at another man.

13    And you go over to XXX XXXXXXXX and what do you find?  You

14    find one man in the car that's still running, Mr. Paxton,

15    still wearing his black hoodie.  You find Mr. Pate, who's

16    running into XXX XXXXXXXX.  At some point -- again, this is

17    nothing you have to decide, but at some point it appears

18    like he took off his black hoodie, hid it behind the couch,

19    and then he changed his appearance and he thinks he's going

20    to get away with it.  That's evidence you can think about,

21    but it has nothing to do with whether or not we've proven

22    felon in possession of a firearm.

23          And this thing about Morgan, I showed you this

24    transcript before.  This is the one where he's talking to --

25    Lewis Pate is talking to his brother Chris, and he says:

1    "Grab, grab my li'l change, man.  Put that shit up, and ask

2    Morgan where that other shit at."  Well, what was found in

3    Morgan's bedroom?  Shotgun shells.  He's not charged with

4    shotgun shells, we don't have to prove that those were his

5    shotgun shells, but it's a little bit funny that he's asking

6    his brother to check with Morgan to find out about that

7    other shit.

8          So, when we talk about reasonable doubt, we talk

9    about the same standard of proof that is used in every

10   courtroom across the country and has been used across the

11   country for over 200 years.  It's the same standard that

12   every jury in your position has to apply and it's a very

13   simple standard.  It is not -- the judge will tell you it's

14   not beyond all possible doubt.  It's not the mere

15   possibility of innocence.  Let me repeat that.  It's not the

16   mere possibility of innocence.  The test is reasonable

17   doubt, and reasonable doubt is a doubt based upon reason and

18   common sense.

19         So I'm suggesting to you that when you go back to

20   the jury room you take with you all the exhibits, although

21   my guess is the judge probably will not have the bullets go

22   back, at least not at the same time as the gun is back

23   there, so don't worry about that.  But you take back all the

24   exhibits, you take your memory of the testimony, but the

25   most important thing you take with you is your good common

1     sense, and if your common sense tells you, yes, Mr. Pate

2     possessed that gun on the day in question, then your verdict

3     must be guilty.

4               Thank you.

5               THE COURT:  Thank you.

6               We will take a five-minute recess before my final

7     instructions to you.  Court will be in recess for five

8     minutes.

9          (Recess taken at 11:18 a.m.)

10                          *  *  *  *  *

11         (11:27 a.m.)

12                          IN OPEN COURT

13              THE COURT:  Good morning again.  Please be seated.

14              The courtroom is locked during the giving of jury

15    instructions, so if either spectator thinks they need to

16    leave in the next 20 minutes or so, you should leave now or

17    you'll be stuck.

18                 **COURT'S INSTRUCTIONS TO THE JURY**

19              THE COURT:  Members of the Jury:

20              Now that you have heard all of the evidence to be

21    received in this case and the arguments of counsel, it

22    becomes my duty to give you the final instructions of the

23    Court as to the law which is applicable to this case and

24    which should guide you in your decisions.

25              All of the instructions given to you by the

 1    Court -- those I gave you at the beginning of the trial,

 2    those I gave you during the trial itself, and this final set

 3    of instructions -- must guide and govern your deliberations.

 4    This set of instructions I am about to give you are in

 5    writing and will be available to you in the jury room, so

 6    you really don't need to take any notes, but if you want to,

 7    of course you can.  I want to emphasize, though, that just

 8    because they are in writing doesn't mean that they are any

 9    more important than my earlier instructions.  Again, all

10    instructions, whether or not given to you in writing, must

11    be followed by the jury.

12            Now, it is your duty as jurors to follow the law

13    as stated in these instructions of the Court and to apply

14    the rules of law to the facts as you find them from the

15    evidence which was received during the trial.

16            The lawyers have quite properly referred to some

17    of the applicable rules of law in their closing arguments to

18    you, but if there's any difference that appears to you

19    between the law as stated to you by counsel and that I'm

20    giving you, you are of course to be governed by the Court's

21    instructions.

22            You are also not to single out any one instruction

23    alone as stating the law, but you should consider these

24    instructions as a whole in reaching your decision.

25            You are also not to be concerned with the wisdom

1    of any rule of law stated by the Court.  Regardless of any

2    opinion you might have as to what the law ought to be, it

3    would be a violation of your sworn duty to base your verdict

4    upon any view or opinion of the law other than that given in

5    these instructions of the Court, just as it would be a

6    violation of your sworn duty as judges of the facts to base

7    your verdict upon anything other than the evidence received

8    in the case.

9         You were chosen as jurors for this trial in order

10   to evaluate all of the evidence received and to decide the

11   factual questions presented by the allegations brought by

12   the Government in the indictment and the plea of not guilty

13   by Lewis Pate.

14        In deciding the issues presented to you for

15   decision in this trial, you must not be persuaded by any

16   bias, prejudice, or sympathy for or against any of the

17   parties to this case or by any public opinion.

18        Justice through trial by jury depends upon the

19   willingness of each individual juror to seek the truth from

20   the same evidence presented to all of the jurors here in the

21   courtroom and to arrive at a verdict by applying the same

22   rules of law as being given to each of you in these

23   instructions of the Court.

24        Now, there is nothing particularly different in

25   the way that a juror should consider the evidence in a trial

1   from that in which any reasonable and careful person would

2   treat any very important question that must be resolved by

3   examining facts, opinions, and evidence.  You are expected

4   to use your good sense in considering and evaluating the

5   evidence in the case for only those purposes for which it

6   was received and to give the evidence a reasonable and fair

7   construction in light of your own common knowledge of the

8   natural tendencies and inclinations of human beings.

9          If Lewis Pate be proved guilty beyond a reasonable

10  doubt, say so.  If not proved guilty beyond a reasonable

11  doubt, say so.

12         Keep constantly in mind that it would be a

13  violation of your sworn duty to base a verdict upon anything

14  other than the evidence which was received in this case and

15  the instructions of the Court.  Remember as well that the

16  law never imposes upon the defendant in a criminal case the

17  burden or duty of calling any witnesses or producing any

18  evidence, because the burden of proving guilt beyond a

19  reasonable doubt is always assumed by the Government.

20         Now, you have been allowed to take notes during

21  the course of the trial and I've noticed that many of you

22  have, and you may take your notes with you to the jury room.

23  But you should not consider your notes as binding or

24  conclusive, whether they are your notes or those of a fellow

25  juror.  Your notes should be used as an aid for your memory,

1    not a substitute for your memory.  You should not give

2    greater weight to a particular bit of evidence solely

3    because you or someone chose to reduce it to writing.  I

4    want to make clear to you that it's your recollection of the

5    evidence which should control, and you should disregard

6    anything contrary to your own recollection which might

7    appear in either your notes or those of one of your fellow

8    jurors.

9            The evidence in this case consists of the sworn

10   testimony of the witnesses, regardless of who may have

11   called those witnesses, all of the exhibits which were

12   received in evidence, regardless of who may have produced

13   the exhibit, and all facts which have been admitted to or

14   stipulated to.

15           When attorneys on both sides stipulate or agree as

16   to the existence of a fact, you may accept that stipulation

17   as evidence and regard that particular fact as having been

18   proved.  You are not required to do so, however, since you,

19   again, as the jury are the sole judges of the facts.

20           Any proposed testimony or proposed exhibits to

21   which an objection was sustained by the Court and any

22   testimony or exhibit stricken by the Court must be entirely

23   disregarded by the jury.

24           And also, anything you may have heard or seen

25   elsewhere outside of this courtroom about the case is not

1      proper evidence and it too must be entirely disregarded.

2              The questions, objections, statements, and even

3      the arguments of counsel are not the evidence in this case,

4      and you must base your base your verdict upon only the

5      evidence received in the case.  In your consideration of the

6      evidence which was received, however, you are not limited to

7      the bald statements of the witnesses or the bald assertions

8      in the exhibits.  In other words, you are not limited solely

9      to what you see and hear as the witnesses testify or the

10     exhibits are admitted.  You are permitted to draw from the

11     facts which you find to have been proved such reasonable

12     inferences as you feel are justified in light of your own

13     experience and common sense.

14              Inferences are simply deductions or conclusions

15     which reason and common sense lead the jury to draw from the

16     evidence received in the case.

17              Now, there are two types of evidence which are

18     generally present during the course of the trial.  One of

19     those is called direct evidence and the other is known as

20     circumstantial evidence.  Direct evidence is the testimony

21     of a person who asserts or claims to have actual knowledge

22     of a fact.  Sometimes we call these eyewitnesses.

23     Circumstance evidence, on the other hand, is proof of a

24     chain of facts and circumstances indicating the existence of

25     a fact.  The law makes absolutely no distinction between the

1    weight or the value to be given to direct or circumstantial

2    evidence.  Nor is a greater degree of certainty required of

3    circumstantial evidence than of direct evidence.  You should

4    weigh all of the evidence in the case, and after weighing

5    all the evidence, if you are not convinced of the guilt of

6    Lewis Pate beyond a reasonable doubt, you must find him not

7    guilty.

8          If any reference by counsel to matters of

9    testimony or exhibits does not coincide with your own

10   recollection of the evidence, it is your recollection which

11   should control during the deliberations and, again, not the

12   statements of counsel, because you, as I've told you several

13   times now, are the sole judges of the facts in this case.

14         The questions asked by a lawyer for either party

15   to this case are also not evidence.  If a lawyer asks a

16   question of a witness which contains an assertion of fact,

17   therefore, you may not consider the assertion by the lawyer

18   as any evidence of that fact.  Another way of saying this

19   would be only the answers are evidence.

20         There have been some charts or summaries which

21   have been prepared by the parties, have been submitted into

22   evidence and were discussed during the trial, and they've

23   been shown to you during the trial for the purpose of

24   explaining facts that are allegedly included in books,

25   records, or other documents which are also in evidence in

1     this case.  You may consider any charts or summaries as you

2     would any other evidence admitted during the trial and give

3     them such weight or importance, if any, that you feel they

4     deserve.

5              You, as the jury, are the sole and exclusive

6     judges of the credibility of each of the witnesses called to

7     testify in this case and only you determine the importance

8     or the weight that their testimony deserves.  After making

9     your assessment concerning the credibility of a witness, you

10    may decide to believe all of that witness's testimony, only

11    a portion of it, or none of it.

12             In making your assessment, you should carefully

13    scrutinize all of the testimony given, the circumstances

14    under which each witness has testified, and every matter in

15    evidence which tends to show whether a witness, in your

16    opinion, is worthy of belief.  Consider each witness's

17    intelligence, motive to falsify, state of mind, and

18    appearance and manner while on the witness stand.  Consider

19    also the witness's ability to observe the matters as to

20    which he or she has testified and whether he or she

21    impresses you as having an accurate memory or recollection

22    of these matters.  Consider also any relation a witness may

23    bear to either side of the case, the manner in which each

24    witness might be affected by your verdict, and the extent to

25    which, if at all, each witness is either supported by or

1    contradicted by other evidence in the case.

2            Now, inconsistencies or discrepancies in the

3    testimony of a witness or between the testimony of different

4    witnesses may or may not cause you to disbelieve or

5    discredit such testimony.  Two or more persons witnessing an

6    incident or a transaction may simply hear or see it

7    differently.  Innocent misrecollection, just like failure of

8    recollection, is not an uncommon experience.  In weighing

9    the effect of a discrepancy, however, always consider

10   whether it pertains to a matter of importance or an

11   insignificant detail and consider whether that discrepancy

12   results from an innocent error or an intentional falsehood.

13           After making your own judgment or assessment

14   concerning the believability of a witness, you can then

15   attach such importance or weight to that testimony, if any,

16   that you feel it deserves.  You will then be in a position

17   to decide whether or not the Government has proven the

18   charge beyond a reasonable doubt.

19           You have heard during the course of this trial the

20   testimony of several law enforcement officers.  The fact

21   that a witness may be employed as a policeman or law

22   enforcement officer does not mean that that testimony is

23   necessarily deserving of more or less consideration or

24   greater or lesser weight than the testimony of an ordinary

25   witness.

1          At the same time, it is quite legitimate for

2     defense counsel to try to attack the credibility of a law

3     enforcement witness on the grounds that his testimony may be

4     colored by a personal or professional interest in the

5     outcome of the case.

6          It is your decision, after reviewing all of the

7     evidence, whether to accept the testimony of a law

8     enforcement witness and to give to that testimony whatever

9     weight, if any, you find it deserves.

10          The testimony of a witness may be discredited or,

11     as we sometimes say, impeached, by showing that that witness

12     previously made statements which are different than or

13     inconsistent with that testimony here in court.  The earlier

14     inconsistent or contradictory statements are admissible only

15     to discredit or impeach the credibility of the witness, and

16     not to establish the truth of these earlier statements made

17     somewhere other than here during this trial.  It is the

18     province of the jury to determine the credibility of a

19     witness who has made prior inconsistent or contradictory

20     statements.

21          If a person is shown to have knowingly testified

22     falsely concerning any important or material matter, you

23     obviously have a right to distrust the testimony of such an

24     individual concerning other matters.  You may reject all of

25     the testimony of that witness or you may give it such weight

1    or credibility as you think it deserves.

2          Your decision on the facts of this case should not

3    be determined by the number of witnesses testifying for or

4    against a party.  You should consider all of the facts and

5    circumstances in evidence to determine which of the

6    witnesses you choose to believe or not believe.  You may

7    find that the testimony of a smaller number of witnesses on

8    one side is more credible than the testimony of a greater

9    number of witnesses on the other side.

10          The defendant in a criminal case has an absolute

11   right under our Constitution not to testify.

12          The fact that Lewis Pate did not testify may not

13   be discussed or considered by the jury in any way when

14   deliberating and arriving at your verdict.  No inference of

15   any kind may be drawn from the fact that a defendant decided

16   to exercise his privilege under the Constitution and did not

17   testify.

18          As stated before, the law never imposes upon a

19   defendant in a criminal case the burden or duty of calling

20   any witnesses or producing any evidence.

21          The rules of evidence ordinarily do not permit

22   witnesses to testify as to their own opinions or their own

23   conclusions about the issues in this case, but there is an

24   exception to this rule for witnesses who are described as

25   expert witnesses.  An expert witness is someone who, by

1    education and experience, may have become knowledgeable in

2    some technical, scientific, or specialized area.  If such

3    knowledge or experience may be of assistance to you in

4    understanding some of the evidence or in determining a fact,

5    an expert witness in that area may state an opinion as to

6    relevant and material matter in which he or she claims to be

7    an expert.

8           You should consider each expert opinion received

9    in evidence in this case and give it such weight as you

10   think it deserves.  You should consider the testimony of

11   expert witnesses just as you would consider the testimony of

12   other witnesses and other evidence in the case.  If you

13   should decide that the opinion of an expert witness is not

14   based upon sufficient education or experience, or if you

15   should conclude that the reasons given in support of the

16   expert opinion are not sound, or if you should conclude that

17   the expert opinion is outweighed by other evidence,

18   including that of other expert witnesses, you may disregard

19   the opinion in part or in its entirety.

20          As I have told you several times, you are the sole

21   judges of the facts in this case.

22          Now, Lewis Pate is not on trial for any acts or

23   crimes which are not specifically alleged in the indictment.

24   Nor may a defendant be convicted of the crime charged even

25   if you were to find that he committed other crimes.

1          The indictment in this case charges that

2    Lewis Pate committed the crime of being a felon in

3    possession of a firearm.  As you know, Mr. Pate has pled not

4    guilty to that charge.

5          As I told you at the beginning of the trial, an

6    indictment is simply an accusation.  It is not evidence of

7    anything.  To the contrary, Lewis Pate is presumed to be

8    innocent.  Thus Lewis Pate, even though charged, began the

9    trial with no evidence against him and the presumption of

10   innocence alone is sufficient to find Lewis Pate not guilty

11   and can be overcome only if the Government proves, beyond a

12   reasonable doubt, each essential element of the crime

13   charged.

14          Again, there is no burden upon a defendant to

15   prove that he is innocent.

16          I instruct you that you must presume Lewis Pate to

17   be innocent of the crime charged.  Thus Lewis Pate, although

18   accused of crimes in the indictment, began the trial with a

19   clean slate -- that is, with no evidence against him.  The

20   indictment is not evidence of anything and the law permits

21   nothing but legal evidence presented before the jury here in

22   court to be considered in support of any charge against

23   Lewis Pate.  The presumption of innocence alone therefore is

24   sufficient to acquit the defendant.

25          The burden is always upon the prosecution to prove

1    guilt beyond a reasonable doubt.  This burden never shifts

2    to a defendant, for the law never imposes upon a defendant

3    in a criminal case the burden or duty of calling any

4    witnesses or producing any evidence.  The defendant is not

5    even obligated to produce any evidence by cross-examining

6    the witnesses for the Government.

7          Now, it is not required that the Government prove

8    guilt beyond all possible doubt.  The test is one of

9    reasonable doubt.  A reasonable doubt is a doubt based upon

10   reason and common sense, and not the mere possibility of

11   innocence.  A reasonable doubt is the kind of doubt that

12   would make a reasonable person hesitate to act.  Proof

13   beyond a reasonable doubt must, therefore, be proof of such

14   a convincing character that a reasonable person would not

15   hesitate to act and rely upon it in the most important of

16   his or her own affairs.

17         Unless the Government proves, beyond a reasonable

18   doubt, that the defendant has committed each and every

19   element of the crime charged in the indictment, you must

20   find Lewis Pate not guilty of that offense.  If the jury

21   after careful and impartial consideration of all of the

22   evidence in this case views the evidence as reasonably

23   permitting either of two conclusions -- one of not guilty

24   and the other of guilty -- the jury must, of course, adopt

25   the conclusion of not guilty.

1        I'm going to read you once again the indictment in

2    this case.  It reads as follows:

3        The United States Grand Jury charges that on or

4    about March 20, 2012, in the State and District of

5    Minnesota, the defendant, Lewis Pate, having previously been

6    convicted of one or more crimes punishable by imprisonment

7    for a term exceeding one year, knowingly possessed in and

8    affecting interstate commerce a firearm, namely an Enfield

9    Model 2, Mark 1 .38 caliber revolver, in violation of Title

10   18, United States Code, Section 922(g)(1) and 924(e).

11       Title 18, United States Code, Section 922(g),

12   provides in relevant part:  "It shall be unlawful for any

13   person who has been convicted in any court, of a crime

14   punishable by imprisonment for a term exceeding one year,

15   to possess in or affecting commerce, any firearm."

16       It is a crime for a felon to possess a firearm, as

17   charged in Count 1 the indictment.  This crime has three

18   elements, which are:

19       One, the defendant had been convicted of a crime

20   punishable by imprisonment for more than one year;

21       Two, after that, the defendant knowingly possessed

22   a firearm, that is, an Enfield Model 2, Mark 1 .38 caliber

23   revolver; and

24       Three, the firearm was transported across a state

25   or international line at some time during or before the

1    defendant's possession of it.

2         You are instructed that the Government and

3    Lewis Pate have agreed that Lewis Pate has been convicted of

4    a crime punishable by imprisonment for more than one year

5    under the laws of Minnesota, and you must consider the first

6    element as having been proven.

7         If you have found beyond a reasonable doubt that

8    the firearm in question was manufactured in a state or

9    country other than Minnesota, and that the defendant

10   possessed that firearm in the state of Minnesota, then you

11   may, but are not required to, find that it was transported

12   across a state line.

13        The term "firearm" means any weapon (including a

14   starter gun) which will or is designed to or may be readily

15   converted to expel a projectile by the action of an

16   explosive.

17        If all of these elements have been proved beyond a

18   reasonable doubt as to Lewis Pate, then you must find

19   Lewis Pate guilty of the crime charged under Count 1 of the

20   indictment; otherwise, you must find Lewis Pate not guilty

21   of this offense.

22        Now, the law recognizes several kinds of

23   possession.  A person may have actual possession or

24   constructive possession.  A person may also have sole

25   possession or joint possession.

1           A person who knowingly has direct physical control

2      over a thing, at a given time, is then in actual possession

3      of it.

4           A person who, although not in actual possession,

5      has both the power and the intention at a given time to

6      exercise dominion or control over a thing, either directly

7      or through another person or persons, is then in

8      constructive possession of it.

9           If one person alone has actual or constructive

10     possession of a thing, possession is sole.  If two or more

11     persons share actual or constructive possession of a thing,

12     possession is joint.

13          Whenever the word "possession" has been used in

14     these instructions, it includes actual as well as

15     constructive motion, and also sole as well as joint

16     possession.

17          The indictment charges, as you may have heard,

18     that the offense was committed "on or about" a certain date.

19          Although it is necessary for the Government to

20     prove beyond a reasonable doubt that the offense was

21     committed on a date reasonably near the date alleged in the

22     indictment, it is not necessary for the Government to prove

23     that the offense was committed precisely on the date

24     charged.

25          Upon next retiring to your jury room to begin your

1    deliberations, you should select one of your members to act

2    as your presiding juror.  The presiding juror will preside

3    over your deliberations and will become your spokesperson

4    here in court.

5              Now, your verdict must represent the collective

6    judgment of the jury.  In order to return a verdict, it is

7    necessary that each juror agree to it.  In other words, your

8    verdict must be unanimous.

9              It is your duty as jurors to consult with one

10   another and to deliberate with one another with a view

11   towards reaching an agreement if you can do so without

12   violence to your own individual judgment.  Each of you must

13   decide the case for himself or herself, but only after an

14   impartial consideration of the evidence in the case with

15   your fellow jurors.  In the course of your deliberations, do

16   not hesitate to reexamine your own views and change your

17   opinion if convinced that it is erroneous.  On the other

18   hand, do not surrender your honest conviction solely because

19   of the opinion of your fellow jurors or for the mere purpose

20   of returning a verdict.

21             Remember at all times that you are not partisans,

22   you are judges, judges of the facts of this case, and your

23   sole interest should be to seek the truth from the evidence

24   received during the trial.

25             Your verdict, again, must be based solely upon the

1    evidence received in the case.  Nothing you have seen or

2    read outside of court may be considered.  Nothing that I

3    have said or done during the course of this trial is

4    intended in any way to somehow suggest to you what I think

5    your verdict should be.  Nothing said in these instructions

6    and nothing in any form of verdict prepared for your

7    convenience is to suggest or convey to you in any way or in

8    any manner any intimation as to what verdict I think you

9    should return, because, of course, what the verdict shall be

10   is the exclusive duty and responsibility of the jury.  As I

11   have told you many, many times, you are the sole judges of

12   the facts.

13        Now, the punishment provided by law for the

14   offense charged in this indictment is a matter exclusively

15   within the province of the Court and should never be

16   considered by the jury in any way in arriving at an

17   impartial verdict as to the offense charged.

18        We have prepared a form of verdict for your

19   convenience and I'll read it to you.  It's very

20   straightforward and simple.  It has the case caption on it.

21        "United States District Court, District of

22   Minnesota.

23        "United States of America, Plaintiff, versus

24   Lewis Pate, Defendant."

25        It has the case criminal number and my initials as

1    having been the judge assigned to the case.

2          And I'm looking at the wrong form, but it begins

3    the same way.  It reads:

4          "We, the Jury in the above-titled matter, find the

5    Defendant, Lewis Pate" -- and you'll write either the words

6    "Not Guilty" or the word "Guilty" -- "of the crime charged

7    in Count One of the Indictment.

8          And it has a signature block for your presiding

9    juror and a place to date the verdict.

10          You will take the form with you to the jury room

11    and, when you have reached a unanimous agreement as to your

12    verdict, you should have your presiding juror write your

13    verdict, fill in the blanks, sign and date the form, and

14    return with your verdict to the courtroom.

15          If for some reason it becomes necessary during

16    your deliberations to communicate with the Court, you may do

17    so by means of a note, signed by your presiding juror or by

18    one or more members of the jury, through the court security

19    officer.  No member of the jury should ever attempt to

20    communicate with the Court by any means other than a signed

21    writing, and the Court will never communicate with any

22    member of the jury on any subject which touches the merits

23    of the case other than in writing or orally here in open

24    court.

25          You will note from the oath about to be taken by

1    the court security officers that they too, as well as all

2    other persons, are forbidden to communicate in any way or

3    any manner with any member of the jury which touches upon

4    the merits of this case.

5            Bear in mind you are never to reveal to any

6    person -- not even to the Court -- how the jury stands,

7    numerically or otherwise, on the question of whether or not

8    the Government has sustained its burden of proof until after

9    you have reached a unanimous verdict.

10           Members of the Jury, your duty is to both the

11   United States and to Lewis Pate, the defendant.  They each

12   have a right to expect that you will see that justice is

13   done.  Your responsibility must be borne courageously and

14   without fear or favor.  It is not an arbitrary power, but

15   one that must be exercised with fairness, sincere judgment

16   and sound discretion.

17           The final test of the quality of your service will

18   lie in the verdict which you return to the Court, and not in

19   the opinions any one of you may hold as you retire from this

20   case.  Remember at all times you are not partisans nor

21   advocates but triers of fact.

22           Counsel, do either of you wish to call to my

23   attention any errors, omissions or corrections given to the

24   jury?

25           Mr. Paulsen?

1              MR. PAULSEN:  No, your Honor.

2              THE COURT:  Mr. Olson?

3              MR. OLSON:  No, your Honor.

4              THE COURT:  The court security officer will unlock

5    the courtroom and come forward to be sworn.

6         (Court security officer sworn by the calendar clerk)

7              THE COURT:  All right.  Ms. Landmark and

8    Ms. Noark, by virtue of your numbers when the jury was

9    originally selected, you have served as the alternates in

10   this case.  I want to thank you very much for being with us.

11   If we get down below 12, we get into trouble and have to

12   start all over, so I want to thank you.  You've been our

13   safety valves here.

14             At this time I'm going to ask the two of you to

15   depart.  You can remove any items you have from the jury

16   room and Gertie will bring you back to my chambers.  I have

17   some certificates and want to thank you personally.  So the

18   two of you may depart at this time and you should leave your

19   notebooks in there as well.

20             Ms. Landmark, you also are an alternate.

21        (Alternate jurors excused)

22             THE COURT:  We will be sending in with you for

23   your use a copy of my instructions, all of the exhibits

24   which were received in evidence and a copy of the jury

25   verdict form.  As Mr. Paulsen appropriately predicted, I

1    don't like you to have both the gun and the bullets for

2    obvious reasons.  We have the same problems with narcotics

3    and such in there.  So, I'm going to ask that you take a

4    quick look.  Let's separate the bullet exhibit out first.

5    Why don't you take a look at those.  We'll send the gun in

6    because there was more talk about that, I guess, and you can

7    have that, but if you want to take a quick look at the

8    bullets first if you need to see them and pass them out.  If

9    you need for some reason to have them back later, let the

10   security officer know.  Otherwise, he'll want you to look at

11   that first and hand that exhibit out to we can so we can

12   separate those two.

13            And then you can get started.  I was going to have

14   you go right away to lunch.  It usually is a good idea for

15   starters, but right at noon is absolutely the worst time to

16   try to get 12 people through the cafeteria downstairs.  So

17   I'm going to suggest that you maybe select your presiding

18   juror and kind of organize your deliberations and then knock

19   on the door.  If it's 1:215 or so, I'll think you'll get

20   through the cafeteria much faster and we will keep you

21   together now until you reach a verdict.

22            All right.  All rise for the jury.

23            (Jury excused)

24            THE COURT:  All right.  Please be seated.  We are

25   outside the presence of the jury.

     1            Any matter the Court needs to address at this time

     2     from the Government, Mr. Paulsen?

     3            MR. PAULSEN:  No.  We have all our exhibits ready,

     4     Mr. Olson's checked them out with me, and maybe should the

     5     bullets go back now before lunch --

     6            THE COURT:  Yeah, I think the bullets, let's hand

     7     those out, and then Ms. Williamson, if you'll wait around.

     8            Jay, do you want to grab that exhibit and then

     9     take it back to the CSO so they've got those, as I

    10     instructed?

    11            MR. OLSON:  I think I left my exhibit.  I know I

    12     had it in my office, so it's not elsewhere.  It must be

    13     downstairs.

    14            THE COURT:  Okay.  That was the --

    15            MR. OLSON:  Just the tape exhibit.

    16            THE COURT:  Okay.  If you want to bring that right

    17     up, that's fine, and those can go in right after lunch.

    18            MR. PAULSEN:  I have my copy of it.  If you can't

    19     find it, we could substitute, but yours has the original

    20     sticker on it.

    21            THE COURT:  All right.  And let's see.  You both

    22     are in the building, so we know how to locate you and I

    23     think that concludes things.

    24            All right.  Court will be in recess.

    25        (Jury begins deliberations at 12:04 p.m.)

```
 1          (4:30 p.m.)

 2                              IN OPEN COURT

 3          (Defendant present)

 4               THE COURT:  The jury should arrive momentarily.

 5          (Jury enters)

 6               THE COURT:  Good afternoon.  Please be seated.

 7               Members of the Jury, have you reached your verdict

 8      in this case?

 9               THE FOREPERSON:  We have.

10               THE COURT:  Would you give it to the court

11      security officer, please.

12          (Verdict handed to the Court via the court security

13           officer)

14          (Pause - Court is reading)

15               THE COURT:  Members of the Jury, listen to your

16      verdict as it will be recorded in the official files of the

17      United States District Court.

18               THE CLERK:  "United States District, District of

19      Minnesota.

20               "United States of America, Plaintiff, versus Lewis

21      Pate, Defendant.

22               "Verdict.

23               "We, the Jury in the above-titled matter, find the

24      Defendant, Lewis Pate, guilty of the crime charged in Count

25      One of the Indictment."
```

```
 1              Signed by the presiding juror and dated
 2      August 15th, 2012.
 3              THE COURT:  Mr. Olson, should we poll the jury?
 4              MR. OLSON:  Yes, Your Honor.
 5              THE COURT:  Please.
 6              THE CLERK:  Members of the Jury, please answer yes
 7      or no as I call your name.
 8              Ms. Herzog, is this your verdict?
 9              THE JUROR:  Yes.
10              THE CLERK:  Ms. Dooley, is this your verdict?
11              THE JUROR:  Yes.
12              THE CLERK:  Ms. Bloodsaw, is this your verdict?
13              THE JUROR:  Yes.
14              THE CLERK:  Ms. Landrum, is this your verdict?
15              THE JUROR:  Yes.
16              THE CLERK:  Ms. Zufall, is this your verdict?
17              THE JUROR:  Yes.
18              THE CLERK:  Mr. Lillegraven, is this your verdict?
19              THE JUROR:  Yes.
20              THE CLERK:  Mr. Manske, is this your verdict?
21              THE JUROR:  Yes.
22              THE CLERK:  Ms. Gashaw, is this your verdict?
23              THE COURT:  Mr. Gashaw.
24              THE CLERK:  Mr. Gashaw.
25              THE JUROR:  Yes.
```

1              THE CLERK:  Ms. Perusse, is this your verdict?

2              THE JUROR:  Yes.

3              THE CLERK:  Ms. Noble, is this your verdict?

4              THE JUROR:  Yes.

5              THE CLERK:  Ms. Tilmon, is this your verdict?

6              THE JUROR:  Yes.

7              THE CLERK:  And Mr. Watschke, is this your

8     verdict?

9              THE JUROR:  Yes.

10             THE CLERK:  The jury has been polled and they call

11    concur.

12             THE COURT:  Thank you, Members of the Jury, for

13    your service in this case.  Your task is now completed and

14    you may be excused.  Please follow the court security

15    officer to the jury deliberation room.

16        (Jury excused)

17             THE COURT:  Please be seated.

18             The jury has spoken through their verdict.  I'll

19    order that there be a presentence investigation, Mr. Pate.

20    Mr. Smith is the gentleman seated at the second table and

21    he'll make sure that process gets started today.

22             Anything further from the Government?

23             MR. PAULSEN:  No, Your Honor.  Should we collect

24    the exhibits after the jury leaves?

25             THE COURT:  Yes.  Those will be brought to you.

1            Anything further, Mr. Olson?

2            MR. OLSON:  No, Your Honor.

3            THE COURT:  Court is in recess.

4        (Proceedings concluded at 4:35 p.m.)

5                    **[ End of trial transcript ]**

6                        *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I  N  D  E  X**

**PAGE**

**GOVERNMENT'S CLOSING ARGUMENT**

    By Mr. Paulsen                                          246

**DEFENDANT'S CLOSING ARGUMENT**

    By Mr. Olson                                            259

**GOVERNMENT'S CLOSING ARGUMENT IN REBUTTAL**

    By Mr. Paulsen                                          281

**COURT'S INSTRUCTIONS TO THE JURY**

    By the Court                                            286

**VERDICT**                                                      310

* * * * *

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate copy of the transcript originally filed

on **FEBRUARY 17, 2013,** incorporating redactions

requested by **AUSA JEFFREY PAULSEN.**  Redactions

appear as "XXXX" in the transcript.



*/s/ Timothy J. Willette*



**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
Official Court Reporter - U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415-2247
612.664.5108